# In the
# United States Court of Appeals
# for the Eighth Circuit

Anthony Schmitt,

*Plaintiff-Appellant,*

v.

Jolene Rebertus, in her official capacity as
Assistant Commissioner of the Minnesota
Department of Corrections; Paul Schnell, in
his official capacity as Commissioner of the
Minnesota Department of Corrections,

*Defendants-Appellees.*

On Appeal from the United States District Court
for the District of Minnesota
District Court No. 0:24-cv-00034-JRT

## PLAINTIFF-APPELLANT'S PRINCIPAL BRIEF

Douglas P. Seaton
James V. F. Dickey
Alexandra K. Howell
UPPER MIDWEST LAW CENTER
12600 Whitewater Dr., Suite 140
Minnetonka, MN 55343
(612) 428-7002

Renee K. Carlson
TRUE NORTH LEGAL
525 Park Street, Suite 460
St. Paul, MN 55103
(612) 789-8811

*Attorneys for Plaintiff-Appellant*

## SUMMARY OF THE CASE

Plaintiff-Appellant Anthony Schmitt is a Christian called by God to minister to men in prison. Acting upon his calling, from 2012 to 2023, Schmitt taught the totally voluntary "Quest for Authentic Manhood" ("Quest") class to inmates at the Minnesota Correctional Facility–St. Cloud ("MCF"). The program has had over a thousand successful graduates. Despite Quest's success, Schmitt has been forbidden from teaching it at MCF since July 2023 precisely because of the religious beliefs Schmitt expresses through the program. On July 10, 2023, Defendant-Appellee Jolene Rebertus of the Minnesota Department of Corrections ("DOC") informed Schmitt that he would no longer be allowed to teach Quest because, to DOC:

> The program directly conflicts with the diversity, equity, and inclusivity values of the department by defining manhood, or the study of masculinity, ***through a biblical lens*** of what a "real man looks like."

This blatant religious targeting violated and continues to violate Schmitt's First Amendment free-exercise and free-speech rights and establishes a denominational preference forbidden by the Establishment Clause.

Schmitt moved for a preliminary injunction, and the district court denied that motion. This appeal follows. This case implicates important First Amendment issues, so Appellant believes the Court should hear oral argument. Appellant requests a total of 30 minutes of oral argument, 15 minutes per side.

i

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Fed. R. App. P. 26.1 and Eighth Circuit Local Rule 26.1A, Appellant is not a corporation.

Appellate Case: 24-2707    Page: 3    Date Filed: 10/21/2024 Entry ID: 5448190

# TABLE OF CONTENTS

SUMMARY OF THE CASE.................................................................i

CORPORATE DISCLOSURE STATEMENT.......................................ii

TABLE OF CONTENTS ..............................................................iii

TABLE OF AUTHORITIES ...........................................................v

JURISDICTIONAL STATEMENT...................................................1

STATEMENT OF ISSUES .............................................................2

STATEMENT OF THE CASE.........................................................4

   I.    Tony Schmitt's religious beliefs. ...................................................6

   II.   The Quest program and its success...............................................8

   III.  The 2018 review of the Quest program. ......................................12

   IV.  Quest is known to be an effective prison ministry at other prisons in the United States, and there is zero evidence of any disruption caused by Quest at MCF—ever. .............................................16

   V.   Appellees abruptly shut down Quest because of Schmitt's religious beliefs expressed through Quest...........................................18

   VI.  Schmitt cannot facilitate Quest to another group in MCF again absent an injunction from this Court.............................................20

   VII. Appellees intentionally discriminate against Bible-based, traditional, orthodox Christian views of sexuality and the roles of men and women in family and society. ....................................21

   VIII. Appellees are responsible for their actions in shutting down Quest and setting DOC policy. ...................................................23

   IX.  Appellees' actions irreparably harm Schmitt and the inmates Schmitt wishes to serve. ...................................................24

   X.   Procedural posture..................................................................25

SUMMARY OF THE ARGUMENT ...............................................26

ARGUMENT .............................................................................26

   I.    Standard of Review..................................................................26

II.    Schmitt has demonstrated a fair chance of prevailing on the merits. .........28

    A. To avoid an injunction, Appellees must carry the heavy burden to show that canceling Quest was justified by a compelling interest and was narrowly tailored in pursuit of that interest. ...........................................29

       1.  Appellees burdened Schmitt's sincere religious practice by targeting his religious beliefs pursuant to a policy that was neither neutral nor generally applicable. .........................................................................31

       2.  Appellees engaged in egregious viewpoint discrimination. .............36

       3.  Appellees engaged in obvious denominational preference in violation of the Establishment Clause. .............................................40

       4.  Appellees cannot satisfy strict scrutiny. ...........................................42

    B. The Turner test does not apply to this case. ...........................................44

    C. Even if Turner does apply to this case, Schmitt has demonstrated a likelihood of success on the merits. .....................................................50

III.    Schmitt has satisfied the remaining Dataphase factors ............................57

**CONCLUSION** ...........................................................................................**59**

**CERTIFICATE OF COMPLIANCE** ....................................................**61**

**CERTIFICATE OF SERVICE** ...........................................................**63**

Appellate Case: 24-2707    Page: 5    Date Filed: 10/21/2024   Entry ID: 5448190

# TABLE OF AUTHORITIES

**CASES**

*Agency for Int'l Dev. v. Alliance for Open Soc'y Int'l, Inc.*, 570 U.S. 205 (2013)....37

*Ams. United for Separation of Church & State v. Prison Fellowship Ministries, Inc.*, 509 F.3d 406 (8th Cir. 2007)........................................................................50

*Ashcroft v. ACLU*, 542 U.S. 656 (2004) ...............................................................42

*Bear v. Kautzky*, 305 F.3d 802 (8th Cir. 2002) ............................................ 29, 58

*Cajune v. Ind. Sch. Dist. 194*, 105 F.4th 1070 (8th Cir. 2024).......................... 37, 38

*Cal. First Amend. Coal. v. Woodford*, 299 F.3d 868 (9th Cir. 2002).....................46

*Capitol Square Rev. & Advisory Bd. v. Pinette*, 515 U.S. 753 (1995) .....................36

*Carson v. Simon*, 978 F.3d 1051 (8th Cir. 2020).....................................................27

*Child Evangelism Fellowship of Minn. v. Minneapolis Special Sch. Dist. No. 1*, 690 F.3d 996 (8th Cir. 2012) ............................................................................40

*Church of Lukumi Babalu Aye v. City of Hialeah*, 508 U.S. 520 (1993) ........ passim

*Cigna Corp. v. Bricker*, 103 F.4th 1336 (8th Cir. 2024) .........................................58

*Colo. Christian Univ. v. Weaver*, 524 F.3d 1245 (10th Cir. 2008) .........................41

*Connick v. Myers*, 461 U.S. 138 (1983).................................................................36

*Cruz v. Beto*, 405 U.S. 319 (1971).......................................................................53

*D.M. ex rel. Bao Xiong v. Minn. State High Sch. League*, 917 F.3d 994 (8th Cir. 2019) .................................................................................................28

*Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109 (8th Cir. 1981) (en banc) ......27

*Dawson v. Scurr*, 986 F.2d 257 (8th Cir. 1993).....................................................52

*Dunn v. Ray*, 139 S. Ct. 661 (2019)......................................................................40

*Elrod v. Burns*, 427 U.S. 347 (1976) (plurality)....................................................57

*Emad v. Dodge Cnty.*, 71 F.4th 649 (7th Cir. 2023).......................................... 48, 53

*Emp. Div. v. Smith*, 494 U.S. 872 (1990)...................................... 31, 34, 47

*Fennell v. Butler*, 570 F.2d 263 (8th Cir. 1978) ....................................................57

*Fulton v. City of Phila.*, 593 U.S. 522 (2021)................................................ passim

Appellate Case: 24-2707    Page: 6    Date Filed: 10/21/2024 Entry ID: 5448190

*Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418 (2006). ........................................................................................... 28, 43

*Good News Club v. Milford Cent. Sch.*, 533 U.S. 98 (2001) ....................................37

*Grayson v. Schuler*, 666 F.3d 450 (7th Cir. 2012)....................................49

*Hernandez v. Comm'r*, 490 U.S. 680 (1989) ............................................41

*Human Rights Def. Ctr. v. Baxter Cnty. Ark.*, 999 F.3d 1160 (8th Cir. 2021) . 46, 54

*Hyland v. Wonder*, 972 F.2d 1129 (9th Cir. 1992) ....................................37

*In re Rouse*, No. 21-1523, 2021 U.S. App. LEXIS 25120 (6th Cir. Aug. 20, 2021) ........................................................................49

*InterVarsity Christian Fellowship/USA v. Univ. of Iowa*, 5 F.4th 855 (8th Cir. 2021)........................................................................................37

*Jarrard v. Moats*, No. 4:20-cv-2, 2021 U.S. Dist. LEXIS 60130 (N.D. Ga. Mar. 30, 2021) ........................................................................47

*Jarrard v. Sheriff of Polk Cnty.*, No. 23-10332, 2024 U.S. App. LEXIS 23482 (11th Cir. Sept. 16, 2024)............................................................... passim

*Johnson v. California*, 543 U.S. 499 (2005)....................................47, 49

*Jones v. N.C. Prisoners' Labor Union, Inc.*, 433 U.S. 119 (1977) ........................46

*Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507 (2022) ................................. passim

*Larson v. Valente*, 456 U.S. 228 (1982) ............................................. passim

*Lee v. Weisman*, 505 U.S. 577 (1992) ....................................................44

*Maisonet v. Comm'r Ala. Dep't of Corr.*, No. 22-10032, 2022 U.S. App. LEXIS 25976 (11th Cir. Sept. 16, 2022) ........................................................48

*Masterpiece Cakeshop, Ltd. v. Colo. Civil Rights Comm'n*, 584 U.S. 617 (2018)............................................................................................ passim

*Maye v. Klee*, 915 F.3d 1076 (6th Cir. 2019) ............................................53

*McCabe v. Arave*, 827 F.2d 634 (9th Cir. 1987) ......................................52

*Minn. Citizens Concerned for Life, Inc. v. Swanson*, 692 F.3d 864 (8th Cir. 2012) ....................................................................... 27, 57

*Mosely v. Bd. of Educ.*, 434 F.3d 527 (7th Cir. 2006)................................37

Appellate Case: 24-2707    Page: 7    Date Filed: 10/21/2024 Entry ID: 5448190

*Murchison v. Rogers*, 779 F.3d 882 (8th Cir. 2015) ........................................ 53, 55

*Murphy v. Collier*, 139 S. Ct. 1111 (2019) ...................................................... 41, 48

*Murphy v. Mo. Dep't of Corr.*, 372 F.3d 979 (8th Cir. 2004) ........................ 45, 54

*Nken v. Holder*, 556 U.S. 418 (2009) ...................................................................57

*Overton v. Bazzetta*, 539 U.S. 126 (2003) ...........................................................47

*Pell v. Procunier*, 417 U.S. 817, 819 (1974) ......................................................46

*Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37 (1983)................38

*Phelps-Roper v. Troutman*, 662 F.3d 485 (8th Cir. 2011) (per curiam)..................27

*Principal Sec., Inc. v. Agarwal*, 23 F.4th 1080 (8th Cir. 2022)...............................27

*Prison Legal News v. Cnty. of Ventura*, No. 14-0773, 2014 U.S. Dist. LEXIS 84575 (C.D. Cal. June 16, 2014) ..........................................................................58

*Prison Legal News v. Livingston*, 683 F.3d 201 (5th Cir. 2012) ..................... 45, 54

*Procunier v. Martinez*, 416 U.S. 396 (1974) ......................................................51

*Ray v. Comm'r, Ala. Dep't of Corr.*, 915 F.3d 689 (11th Cir. 2019) .............. 40, 41

*Reed v. Town of Gilbert*, 576 U.S. 155 (2015)...........................................................37

*Rodgers v. Bryant*, 942 F.3d 451 (8th Cir. 2019) ........................................... 57, 58

*Roe v. Crawford*, 514 F.3d 789 (8th Cir. 2008).....................................................47

*Roman Catholic Diocese v. Cuomo*, 592 U.S. 14 (2020) (per curiam) .................57

*Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819 (1995)....................................................................................................... 37, 38, 40

*Rumsfeld v. FAIR*, 547 U.S. 47, 59 (2006) .............................................................37

*Sch. Dist. of Abington Twp. v. Schempp*, 374 U.S. 203 (1963) ..............................42

*Shakur v. Selsky*, 391 F.3d 106 (2d Cir. 2004) ......................................................51

*Sherbert v. Verner*, 374 U.S. 398 (1963) .............................................................35

*Shimer v. Washington*, 100 F.3d 506 (7th Cir. 1996)............................................53

*Sisney v. Kaemingk*, 15 F.4th 1181 (8th Cir. 2021). ..................................... passim

*Sleep No. Corp. v. Young*, 33 F.4th 1012 (8th Cir. 2022)................................ 27, 28

Appellate Case: 24-2707     Page: 8     Date Filed: 10/21/2024 Entry ID: 5448190

*Thornburgh v. Abbott*, 490 U.S. 401 (1989) ................................................ 45, 46, 51

*Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449 (2017) .. passim

*Tumey v. Mycroft AI, Inc.*, 27 F.4th 657 (8th Cir. 2022) ........................................27

*Turner v. Safley*, 482 U.S. 78 (1987) ............................................................... passim

*United States v. Virginia*, 518 U.S. 515 (1996) ........................................................43

*Vester v. Rogers*, 795 F.2d 1179 (4th Cir. 1986) ....................................................47

*W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624 (1943) ............................. 30, 34

*Watkins Inc. v. Lewis*, 346 F.3d 841 (8th Cir. 2003) ..............................................28

*Wildhawk Invs., LLC v. Brava I.P., LLC*, 27 F.4th 587 (8th Cir. 2022) ....................29

*Wilson v. NLRB*, 920 F.2d 1282 (6th Cir. 1990) ....................................................41

*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008) ........................................27

*Zorach v. Clauson*, 343 U.S. 306 (1952) ................................................................28

## STATUTES

Minn. Stat. §241.01, subd. 1 ....................................................................................23

Minn. Stat. §241.01, subd. 3a(d) .............................................................................24

Minn. Stat. §241.01, subd. 3a(h) .............................................................................24

Minn. Stat. §241.05 ..................................................................................................24

Minn. Stat. §243.75 ..................................................................................................24

Minn. Stat. §244.03, subd. 1(a)(5) .................................................................... 24, 35

## OTHER AUTHORITIES

Fed. R. Civ. Pro. 65 ..................................................................................................26

Linda Keena, et al., *Reaching the Invisible Victim: Men's Fraternity as Restorative Justice*, 1 Int'l J. Humans. & Soc. Sci. 1 (2011) ......................................... 5, 9, 16

*Prison Ministry*, Inside Out Recovery, (accessed Oct. 15, 2024) ..........................18

*Quest for Authentic Manhood Program at LeBlanc Unit*, Tex. Dep't of Crim. Just. (Feb. 2022) ..........................................................................................................16

The Bible .................................................................................................. 6, 7, 14

Appellate Case: 24-2707     Page: 9     Date Filed: 10/21/2024 Entry ID: 5448190

## JURISDICTIONAL STATEMENT

The district court had subject-matter jurisdiction pursuant to 28 U.S.C. §§1331 and 1343 because Appellant alleged violations of his First Amendment rights and 42 U.S.C. §§1983 and 1988.[1] Appellant moved for a preliminary injunction, and the district court denied Appellant's motion on August 22, 2024.[2] This Court thus has jurisdiction over this appeal pursuant to 28 U.S.C. §1292(a)(1) because the denial of Appellant's motion for a preliminary injunction is an order of a United States district court "refusing . . . [an] injunction[]."

Appellant timely filed the notice of appeal from that order the same day it was issued, on August 22, 2024.[3] While this appeal is from an interlocutory order appealable as of right under 28 U.S.C. §1292(a)(1), the district court also entered judgment related to the order refusing the injunction on August 23, 2024.[4] The appeal is timely regardless of whether it is treated as from the appealable order or the judgment. Fed. R. App. P. 4(a)(2).

---

[1] J.App.Vol.1 19-27; R.Doc. 1; Compl. ¶¶88-143.

[2] J.App.Vol.2 269; R.Doc. 38 at 12; Add. 12.

[3] J.App.Vol.2 270; R.Doc. 39; Notice of Appeal.

[4] J.App.Vol.2 272; R.Doc. 40; Judgment.

1

# STATEMENT OF ISSUES

1.  Whether the district court erred by denying Schmitt's motion for a preliminary injunction, where Schmitt seeks reinstatement of his successful and voluntary prison ministry after Appellees cancelled it because, in Appellees' words, "[t]he program directly conflicts with the diversity, equity, and inclusivity values of the department by defining manhood, or the study of masculinity, through a biblical lens of what a 'real man looks like.'"

Apposite Cases and Statutes:
1. *Fulton v. City of Phila.*, 593 U.S. 522 (2021);
2. *Masterpiece Cakeshop, Ltd. v. Colo. Civil Rights Comm'n*, 584 U.S. 617 (2018);
3. *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819 (1995);
4. *Jarrard v. Sheriff of Polk Cty.*, No. 23-10332, 2024 U.S. App. LEXIS 23482 (11th Cir. Sep. 16, 2024).

2.  Whether the district court erred by holding that *Turner v. Safley*, 482 U.S. 78 (1987), provides the appropriate standard of review.

Apposite Cases and Statutes:
1. *Turner v. Safley*, 482 U.S. 78 (1987);
2. *Cal. First Amend. Coal. v. Woodford*, 299 F.3d 868 (9th Cir. 2002);
3. *Emad v. Dodge Cnty.*, 71 F.4th 649 (7th Cir. 2023);
4. *Johnson v. California*, 543 U.S. 499 (2005).

3.  Whether the district court erred by holding that Schmitt failed to show a likelihood of success on the merits.

Apposite Cases and Statutes:
1. Same as issue 1.

2

4.  Whether the district court erred by holding that Schmitt failed to show irreparable harm.

> Apposite Cases and Statutes:
> 1. *Roman Catholic Diocese v. Cuomo*, 592 U.S. 14 (2020) (per curiam);
> 2. *Elrod v. Burns*, 427 U.S. 347 (1976) (plurality).

5.  Whether the district court erred in concluding that the balance of harms and public interest favor Appellees.

> Apposite Cases and Statutes:
> 1. *Rodgers v. Bryant*, 942 F.3d 451 (8th Cir. 2019);
> 2. *Bear v. Kautzky*, 305 F.3d 802 (8th Cir. 2002).

3

## STATEMENT OF THE CASE

Anthony Schmitt is a Christian called by God to minister to men in prison. Acting upon his calling, from 2012 to 2023, Schmitt facilitated "Quest for Authentic Manhood" ("Quest") at the Minnesota Correctional Facility – St. Cloud (the "MCF"). Quest utilizes DVD instructional sessions, in-person facilitation, and assignments to help men learn how to live lives of "authentic manhood" as modeled by Jesus Christ and directed by the Word of God. By doing so, Quest also facilitates successful transitions to the community for male prison inmates. This class always was and will be completely voluntary for inmates to attend.

And, as those who attended it testify, Quest worked. Schmitt and his colleagues taught the class to more than a thousand inmates at MCF over more than a decade, and it has been highly successful in helping rehabilitate inmates. Schmitt held graduation ceremonies for those completing the course, where inmates shared their thoughts on Quest. At these ceremonies, tears were shed, inmates reported that families had been restored, resentments had been healed, sons had told their fathers they loved them and were proud of them, and fathers had told their sons the same. For some, this was the first time these words were spoken in their lives.

Despite Quest's success, Schmitt has been forbidden from teaching the Quest program at MCF since July 2023. Why? Expressly because of the religious beliefs Schmitt expresses through Quest. On July 10, 2023, Appellee Jolene Rebertus

4

informed Schmitt in writing that he would no longer be allowed to teach Quest. The letter stated, most relevantly:

> The program directly conflicts with the diversity, equity, and inclusivity values of the department by defining manhood, or the study of masculinity, ***through a biblical lens*** of what a "real man looks like."[5]

Incredibly, Rebertus admitted in this letter that Appellees are openly discriminating against Schmitt because of the ***biblical*** basis for his religious beliefs. *Id.* This violated and continues to violate Schmitt's constitutional rights.

Furthermore, Appellees' actions are based on an irrational preference for state-approved religious beliefs that ignore evidence-based studies of Quest demonstrating that Quest is effective at helping male inmates and poses no harm to them.[6] Appellees have zero evidence of any disruption at MCF caused by Quest and relied below on pure speculation in a self-serving affidavit to baselessly claim that Quest could, somehow, cause somebody harm.

---

[5] J.App.Vol.1 91; R.Doc. 16-2; Schmitt Decl., Ex. B at 3 (emphasis added).

[6] *E.g.*, Linda Keena, et al., *Reaching the Invisible Victim: Men's Fraternity as Restorative Justice*, 1 Int'l J. Humans. & Soc. Sci. 1, 1 (2011), https://www.ijhss-net.com/journals/Vol_1_No_17_Special_Issue_November_2011/1.pdf.

5

Appellees' actions have irreparably harmed Schmitt because Appellees cancelled Quest and have refused to reinstate it. Absent an injunction[7] requiring Appellees to allow Schmitt to teach the class in the same manner he was teaching it before its cancellation, he will continue to experience harm that only this Court's action can fix. And if Schmitt is allowed to resume teaching Quest at MCF, he will.

**I.    Tony Schmitt's religious beliefs.**

Schmitt is a Christian. He believes that the Bible is the inerrant Word of God and provides guidance for all essential doctrine, knowledge, and instruction for daily living.[8] Consistent with the Bible, Schmitt believes that, in creating human beings as both male and female, God created them as uniquely distinct and, therefore, their innate differences are not an artificial construct of culture but rather distinctions created by God as part of the created order of the universe.[9] Schmitt also believes that all men and women have equal dignity in the eyes of God because they are created in the very image of God.[10]

---

[7] Appellees' counsel indicated in a meet-and-confer conversation on February 8, 2024, that Appellees would not agree to reinstate the Quest program, necessitating this motion. *See also infra* facts section VI.

[8] *2 Timothy 3:16-17*; J.App.Vol.1 71; R.Doc. 16; Schmitt Decl. ¶2.

[9] *Genesis 1:26-27*; J.App.Vol.1 71-72; R.Doc. 16; Schmitt Decl. ¶¶3, 6.

[10] J.App.Vol.1 72; R.Doc. 16; Schmitt Decl. ¶7.

Based on their God-created distinctions, Schmitt believes that men and women occupy distinctly different roles in family and society.[11] Schmitt believes that in the marriage relationship, the man has a biblical command to love and care for his wife and family as head of the household just as Christ is the head of the Church. As a result, the male leadership role is critically important for a healthy marital relationship, as it sets the tone for and fosters mutual respect between men and women: men are called to submit to and love their wives, and women are called to submit to and love their husbands. The Bible commands mutual respect toward one another, and even calls men to the high standard of understanding, honoring, and valuing their wives.[12]

Schmitt also believes he has a calling to minister to men in prison, a calling repeatedly encouraged throughout the Bible, including expressly by Jesus Christ.[13] It is Schmitt's sincere belief that many men commit crimes because they lack a relationship with God through Jesus Christ and grew up in households with abusive or absent fathers, where they were subject to abuse and neglect that led to criminal behavior.[14] Through repentance and rehabilitation, Schmitt believes any person can

---

[11] J.App.Vol.1 71; R.Doc. 16; Schmitt Decl. ¶4.

[12] *1 Corinthians 11:3*; *Galatians 5*; J.App.Vol.1 72; R.Doc. 16; Schmitt Decl. ¶5.

[13] *Psalm 146*; *Matthew 25:36-40*; *Hebrews 13:1-3*; J.App.Vol.1 72; R.Doc. 16; Schmitt Decl. ¶8.

[14] J.App.Vol.1 72; R.Doc. 16; Schmitt Decl. ¶9.

live physically, spiritually, emotionally, and mentally healthy lives through the healing power of Christ. The healing power of Christ, Schmitt believes, enables successful assimilation back into the community, leading to a stable, productive, God-honoring life that is beneficial to both the individual and the community.[15]

## II.   The Quest program and its success.

The Quest program teaches the long-established, mainstream Christian principle, based in the Bible, that men and women have distinct, complementary roles of equal value to God, themselves, and society.[16] Quest is based entirely on biblical principles and is expressly designed to teach and communicate what the Bible teaches.[17] Quest was created and narrated by Dr. Robert Lewis, through the organization "Authentic Manhood." It states its purpose as follows:

> Authentic Manhood is all about setting men up to live lives of truth, passion and purpose. Our resources offer clear and practical Biblical insights on God's design for manhood that are both refreshing and inspiring. We point men to a gospel-centered vision of life that sets them up to enjoy God's grace as they pursue the promises of His Word.[18]

---

[15] J.App.Vol.1 73; R.Doc. 16; Schmitt Decl. ¶10.

[16] J.App.Vol.1 73; R.Doc. 16; Schmitt Decl. ¶12.

[17] J.App.Vol.1 74; R.Doc. 16; Schmitt. Decl. ¶15.

[18] J.App.Vol.1 74; R.Doc. 16; Schmitt Decl. ¶16 (citing J.App.Vol.1 9; R.Doc. 1; Compl. ¶38).

8

The Quest program has 24 DVD videos, and each class involves a 45-minute video "session" followed by discussion, for a total of about one hour.[19] Each video covers very difficult issues in relationships with fathers, mothers, wives, and girl-friends that many men, including those at MCF, have encountered.[20] Quest provides Biblical principles to address these wounds and helps participants overcome the difficulties and challenges these wounds have created through a relationship with Jesus Christ as Lord and Savior.[21] In addition to MCF, Quest has been presented (and still is presented) at churches and in prisons across the United States.[22]

Motivated by his beliefs and calling, in about 2012 Schmitt approached Bill Dornbush, then the Chaplain at MCF, and inquired about volunteering at MCF to facilitate the Quest program.[23] They agreed it would be a good program for the men incarcerated at MCF.[24] Since it was implemented at MCF, Quest was a voluntary

---

[19] J.App.Vol.1 73; R.Doc. 16; Schmitt Decl. ¶13 (citing J.App.Vol.1 8; R.Doc. 1; Compl. ¶36).

[20] J.App.Vol.1 74; R.Doc. 16; Schmitt Decl. ¶17.

[21] J.App.Vol.1 74; R.Doc. 16; Schmitt Decl. ¶18.

[22] J.App.Vol.1 74; R.Doc. 16; Schmitt Decl. ¶19. *See also* Keena, et al., *supra*, n.6.

[23] J.App.Vol.1 73; R.Doc. 16; Schmitt Decl. ¶11.

[24] J.App.Vol.1 74; R.Doc. 16; Schmitt Decl. ¶20. J.App.Vol.1 96-97; R.Doc. 17; Dornbush Decl. ¶4.

Appellate Case: 24-2707     Page: 18     Date Filed: 10/21/2024 Entry ID: 5448190

program, and, if offered again, always will be.[25] Schmitt never has and would not request that Quest be mandatory in any way.[26]

From 2012 until the onset of COVID-19 in 2020, Schmitt and his colleague taught Quest at MCF in two sessions each week.[27] During each session, a video would be presented, followed by questions and discussion.[28] MCF advertised Quest in each of the housing units of the prison, and the men voluntarily signed up by contacting Dornbush, with the understanding this would be a commitment for 12 weeks with meetings twice a week.[29] For many men, this was a big commitment.[30] Quest quickly became a success.[31]

As the first 12-week class of Quest came to an end, inmates excitedly approached Dornbush asking if they could take the course again. Schmitt and Dornbush asked those wanting to repeat the course to help facilitate discussion in a small group of

---

[25] J.App.Vol.1 75; R.Doc. 16; Schmitt Decl. ¶21. J.App.Vol.1 97; R.Doc. 17; Dornbush Decl. ¶7.

[26] J.App.Vol.1 75; R.Doc. 16; Schmitt Decl. ¶21.

[27] J.App.Vol.1 75; R.Doc. 16; Schmitt Decl. ¶22.

[28] *Id.*

[29] J.App.Vol.1 75; R.Doc. 16; Schmitt Decl. ¶26. J.App.Vol.1 97; R.Doc.17; Dornbush Decl. ¶7.

[30] J.App.Vol.1 97; R.Doc. 17; Dornbush Decl. ¶7.

[31] J.App.Vol.1 75; R.Doc. 16; Schmitt Decl. ¶24. J.App.Vol.1 97; R.Doc. 17; Dornbush Decl. ¶6.

Appellate Case: 24-2707     Page: 19     Date Filed: 10/21/2024 Entry ID: 5448190

five to seven inmates. These small-group discussions facilitated relationship build-
ing and provided a great opportunity for men to encourage each other in a positive
way in the prison environment.[32]

Quest was so popular that advertising in the living units became no longer re-
quired. Instead, the men who had graduated would advertise it by sharing with other
men what they were learning and how it was positively affecting their lives. This
word-of-mouth advertising resulted in a full list of men signed up for the next class
even before the existing class was complete. From that time on, every new Quest
class was full to the chapel's 49-person capacity.[33]

By the end of each program, because inmates at MCF are often transferred, there
were usually 25-35 men who graduated. Schmitt and his colleague would present 17
videos from Quest instead of all 24 to ensure that as many men as possible could
graduate. They chose the 17 best videos from the Quest program, based on how
important the material was, in consideration of their religious beliefs.[34]

---

[32] J.App.Vol.1 75-76; R.Doc. 16; Schmitt Decl. ¶¶27-28. J.App.Vol.1 97-98; R.Doc.
17; Dornbush Decl. ¶8.

[33] J.App.Vol.1 76; R.Doc. 16; Schmitt Decl. ¶¶29-31. J.App.Vol.1 98; R.Doc. 17;
Dornbush Decl. ¶¶10-11.

[34] J.App.Vol.1 76-77; R.Doc. 16; Schmitt Decl. ¶¶31-32.

Quest became the most popular religious program out of MCF's approximately 45 other programs run in the chapel. Dornbush considered Quest MCF's premier religious program, graduating over 900 men during his tenure.[35]

Over the years running this program, Dornbush and Schmitt had many incarcerated men tell them how important Quest was in their life, and how it changed their thinking and gave them practical tools for their future. The Quest program was so successful, and the testimonies of the participants so powerful, that Dornbush decided cake and coffee would be served at each graduation ceremony.[36]

### III.  The 2018 review of the Quest program.

In July 2018, Charles 'Pete' Sutter, Statewide Recidivism Re-duction Project Supervisor, reviewed the Quest program.[37] Sutter's findings were mostly positive, including:

- **Program staff exhibited strong prosocial values.** Quest group facilitators are passionate, knowledgeable and believe in offender change. Programs whose staff are selected for their strong support of offender change, empathy and fairness see better outcomes with regard to recidivism reduction. It was clear from my observation that Tony and Bruce exhibited all of these traits, had a very non-confrontational style and cared about the men they served.

---

[35] J.App.Vol.1 77; R.Doc. 16; Schmitt Decl. ¶33. J.App.Vol.1 98-99; R.Doc. 17; Dornbush Decl. ¶¶12, 14.

[36] J.App.Vol.1 77; R.Doc. 16; Schmitt Decl. ¶¶34, 37-38. J.App.Vol.1 99; R.Doc. 17; Dornbush Decl. ¶15.

[37] J.App.Vol.1 85; R.Doc. 16-1; Schmitt. Decl., Ex. A at 1.

- **The program is supported by institutional administration at MCF-St. Cloud.** Programs supported by institutional administration have participants that are more successful upon release. The group receives regular referrals, high praise from stakeholders, and there was no indication of dissatisfaction with the program from institutional staff.

- **The Quest program addresses appropriate targets.** Programs effective at reducing recidivism and changing offender behavior focus on criminogenic needs. Criminogenic needs are the thoughts, behaviors and environmental factors that produce crime and include; anti-social attitudes, values, and beliefs, anti-social peers, substance abuse, employability, education and familial influence. Through a cursory review of Quest's programming, it appeared that it was addressing several criminogenic factors; including modules that focused on changing pro criminal attitudes, anger and hostility, promoting family affection, problem solving skills, and increasing self-control.

- **Length of treatment.** The Quest program is designed to be completed in 26 weeks, or about 6 months. The literature on evidence based practices states that programming should last between 3 and 9 months and not to exceed a year for most offenders.

- **The group caters to different learning styles.** Quest uses a variety of approaches that respond well to various learning styles. The use of videos, discussion and workbooks allows men with different learning styles to take in the material in ways that work best individually. This goes a long way in building an optimal learning environment and adheres to principals regarding specific responsivity.[38]

The department's findings also included some perceived negatives, including that the program did not exclude anyone unless it was full, that recidivism risk levels were mixed (that there were not separate groups for high-risk versus low-risk

---

[38] J.App.Vol.1 86; R.Doc. 16-1; Schmitt Decl., Ex. A at 2.

inmates), and that lecture-and-process group activities are not necessarily as effective as other approaches in reducing recidivism.[39] Sutter also included one final finding, that the "Remembering Dad" video session

> discussed, among other things, the injuries caused by growing up in a household with an absent father. Of those injuries, sexual orientation was mentioned and described homosexuality as an injury. This view is not supported by research is offensive and close to running afoul of Minnesota's Human Rights Act. [sic] It should be noted that, [sic] some jurisdictions are now stating that treatment that addresses homosexuality as a treatable character defect are psychologically damaging and illegal. You should remove this from Quest's programming.[40]

A portion of the view expressed in the "Remembering Dad" session is consistent with Schmitt's religious belief that homosexual acts are sinful (*Leviticus 20:13; Romans 1:27*), not solely driven by innate sexual orientation (*James 1:13-15*), and cause separation between people and God, as all sin does (*Romans 3:23*), but can be avoided through repentance and the grace of God. Despite Schmitt's agreement with Quest that homosexual acts are sinful according to the Bible, Schmitt decided to fast-forward through that one small segment of the "Remembering Dad" session going forward, to avoid unnecessary conflict and continue to present the remainder of Quest without edit.[41]

---

[39] J.App.Vol.1 86-87; R.Doc. 16-1; Schmitt Decl., Ex A at 2-3.

[40] J.App.Vol.1 87; R.Doc. 16-1; Schmitt Decl., Ex. A at 3.

[41] J.App.Vol.1 78; R.Doc. 16; Schmitt Decl. ¶¶40-41.

After Sutter's review, Quest continued for about two years without negative incident. Even better, the program continued to be successful: many more inmates graduated and had a positive experience.[42] A few months before COVID-19 emerged, Schmitt was able to get a portable baptistry to MCF for the participants in the Quest program, and Schmitt and his colleagues were able to meet 44 inmates' requests to be baptized because they had found faith in Jesus.[43]

On March 17, 2020, MCF shut down all religious programming, including Quest, because of COVID-19. It was not until 2023 that religious programing at MCF would resume.[44]

After resuming, because of the difficulties created the government's response to COVID-19, Schmitt selected the 11 videos from the Quest program which Schmitt believed were best equipped to help the inmates, including videos that help them find salvation through a personal relationship with Jesus Christ as Lord and Savior.

---

[42] Dennis Angell is one such individual who had a positive experience. The Quest program changed his life and, now living and working in New Ulm, Minnesota with his wife, he is forever grateful to have been a part of Quest. J.App.Vol.1 103, 106; R.Doc. 18; Angell Decl. ¶¶1-3, 21. Angell is especially grateful to the volunteers running the Quest program, who were always welcoming, encouraging, and provided a living witness of how the Quest program can change a life. J.App.Vol.1 105-106; R.Doc. 18; Angell Decl. ¶¶19-20.

[43] J.App.Vol.1 79; R.Doc. 16; Schmitt Decl. ¶¶42-43.

[44] J.App.Vol.1 79; R.Doc. 16; Schmitt Decl. ¶¶44-45. J.App.Vol.1 99; R.Doc. 17; Dornbush Decl. ¶13.

15

This was designed to ensure the inmates get through the most essential materials in the Quest program. Despite these challenges, Quest continued to achieve the same positive results.[45]

### IV. Quest is known to be an effective prison ministry at other prisons in the United States, and there is zero evidence of any disruption caused by Quest at MCF—ever.

At other prisons, the very same Quest program has had similar success.[46] For example, one study of Quest involved "in-depth, structured interviews with inmates."[47] Researchers concluded that Quest participants "have reconciled with parents, became more open in their communication, supported and connected with spouses and encouraged children toward conventional behaviors."[48] In conclusion, "early involvement with Men's Fraternity can heal family relations, provide the inmate with a stronger support group and thus result in fewer behavior problems."[49]

---

[45] J.App.Vol.1 79; R.Doc. 16; Schmitt Decl. ¶¶45-46.

[46] *See, e.g.*, *Quest for Authentic Manhood Program at LeBlanc Unit*, Tex. Dep't of Crim. Just. (Feb. 2022), https://tdcj.texas.gov/connections/-articles/2022/20220228_Quest_for_Authentic_Manhood.html.

[47] Keena, et al., *supra*, n.6 at 1.

[48] *Id.* at 9.

[49] *Id.*

In contrast, there is no evidence to support Appellees' claim that "Quest's teachings reinforce negative stereotypes."[50] Appellees' claim is based entirely on unsupported conjecture that beliefs which contradict Appellees' worldview are dangerous.[51] Appellees appear to imply that the very existence of mainstream Christian doctrine which is millennia-old on the MCF campus could lead to "harassment and discrimination"—with no evidence that any harassment or discrimination has ever been associated with Quest or Schmitt teaching it.[52]

Contrary to Appellees' characterization, Quest teaches, consistent with long-standing Christian doctrine, that men and women have distinct, complementary roles which are of equal value to God, themselves, and society.[53] Appellees' argument that Quest "devalues" people is pure conjecture—again, derived from Appellees' anti-Christian worldview—which demonstrates that the source of Appellees' argument is their animus toward Schmitt's religious beliefs. Appellees blame Schmitt's

---

[50] J.App.Vol.1 113; R.Doc. 21; Defs.' Mem. Opp. Mot. for Preliminary Injunction ("Defs.' Mem.") at 7 (citing J.App.Vol.1 134-135; R.Doc. 22; Rebertus Decl. ¶12).

[51] J.App.Vol.1 132-137; R.Doc. 22; Rebertus Decl. ¶¶8-15.

[52] *See id.* Rebertus Decl. ¶10.

[53] J.App.Vol.1 8; R.Doc. 1; Compl. ¶35.

Appellate Case: 24-2707    Page: 26    Date Filed: 10/21/2024 Entry ID: 5448190

religious beliefs for causing criminal behavior; in contrast, Quest and Schmitt helped inmates address wounds.[54]

## V. Appellees abruptly shut down Quest because of Schmitt's religious beliefs expressed through Quest.

On July 10, 2023, Appellees abruptly shut down Quest. As Rebertus's email to Schmitt shows, this decision was made because Appellees concluded that Schmitt's religious beliefs expressed through Quest related to manhood and sexuality were contrary to the DOC's "diversity, equity, and inclusivity" values. The email states, in full:

> After review of The Quest for Authentic Manhood curriculum, the decision has been made to discontinue offering this program at MCF- St. Cloud to incarcerated individuals.
>
> The program directly conflicts with the diversity, equity, and inclusivity values of the department by defining manhood, or the study of masculinity, through a biblical lens of what a "real man looks like". Throughout all sessions reviewed, men were only identified as heterosexual, seeking ideal relationships and marriage with women. It is evident that throughout this curriculum, manhood can only be achieved through heterosexual relationships.
>
> Additionally, throughout many of the sessions, women are also identified as the problem for creating "soft males", described as indecisive and weak. Women are described as having fragile frames and not physically as strong. Mothers are described as ignorant, suffocating, needy,

---

[54] J.App.Vol.1 9; R.Doc. 1; Compl. ¶¶39-40. A key principle of Quest is "accepting responsibility." *Prison Ministry*, Inside Out Recovery, https://insideoutrecovery.org/prison-ministry/#:~:text=and%20self%2Dimprovement.-,Accepting%20Responsibility,perpetuating%20a%20cycle%20of%20victimhood (accessed Oct. 15, 2024).

18

and unwilling to release control of their sons. The ideal marriage core role for the wife is described as the "helper" and husband as the "head". Women are described as submissive in this role, keeping his leadership in her view, not competing with him, and to wait for him to take charge. While the teachings do describe the woman in this role as "honorable", the reinforced stereotypes and biases can be hurtful and downright dangerous for those participants who either committed acts of violence, domestic violence, or may be victims of violence by women.

Our population should be able to explore their identity with professionals who root practice and teachings safely in trauma informed science and research. The complete disregard for identifying anyone as a "successful man" who doesn't fit the picture outlined in these sessions completely defies our mission of a person-centered approach to transforming lives.

Religious services are provided in our prisons as an ongoing opportunity to explore and practice teachings and traditions of an individual's choosing. However, just because a program identifies as a religious program does not mean the DOC must provide it. Quest teaches participants about manhood through a lens of discrimination, exclusivity, gender biases and stereotypes that not only contradict the DOC's mission of providing transformational programming, but can be hurtful to participants, their families, and victims.

Jolene Rebertus, MA, LPCC, LICSW
Assistant Commissioner, Health, Recovery, & Programming[55]

Schmitt asked Rebertus to reconsider, and Rebertus refused.[56] To date the ban

remains: Quest does not operate in MCF because Appellees stopped it from

---

[55] J.App.Vol.1 91; R.Doc. 16-2; Schmitt Decl., Ex. B at 3.

[56] J.App.Vol.1 95; R.Doc. 16-3; Schmitt Decl., Ex. C, at 3.

19

operating. If allowed to operate again, Schmitt would resume Quest's programming in MCF.[57]

## VI. Schmitt cannot facilitate Quest to another group in MCF again absent an injunction from this Court.

At the hearing below, counsel for Appellees stated, in relevant part:

> Mr. Schmitt can interact or communicate with St. Cloud's incarcerated persons through the same ways that any community member can. That's through in-person visits, video visits, telephone calls, through the mail and also what is called O-Mail, which is the prison's version of e-mail, and through any of those mechanisms, he can express his religious beliefs, and he can discuss the same content that was in Quest. (Tr. 19:17-25).
> . . . .
> There is nothing about the material that Mr. Schmitt can't share with individuals one on one. (Tr. 21:14-18).[58]

It appears that counsel was referring to Appellee Rebertus's testimony that "Mr. Schmitt is free to apply to teach a ***different program*** at a DOC prison. Mr. Schmitt can also correspond with incarcerated individuals by mail, and visit individuals incarcerated at MCF-SCL or any other prison pursuant to the DOC's ***visiting policy***."[59] Rebertus also testified, "The DOC's decision to discontinue Quest was based on the

---

[57] J.App.Vol.1 80; R.Doc. 16; Schmitt Decl. ¶51.

[58] Tr. 19, 21.

[59] J.App.Vol.1 137; R.Doc. 22; Rebertus Decl. ¶15 (emphasis added).

***problematic content*** that was being taught to incarcerated individuals as part of the curriculum."[60]

There are three (likely inconsistent) conclusions that result from Rebertus's sworn testimony and her counsel's statements on the record: (1) Schmitt may teach a *different* set of religious beliefs through another group program at MCF that is approved by the State of Minnesota, but not *his* through *Quest*; (2) Quest's content is "problematic" and cannot safely be taught at MCF; and (3)Schmitt can discuss Quest's materials with individuals in a *one-on-one* capacity—assuming Schmitt knows them or is somehow introduced to them with no opportunity to invite them to a class. But there is no evidence in the record that he can facilitate the group sessions that were so impactful to over a thousand inmates. The fact is, Schmitt's Quest class was cancelled because of *his* religious beliefs that also happen to be expressed in Quest, and Schmitt cannot facilitate Quest to another group in MCF again absent an order from this Court.

### VII. Appellees intentionally discriminate against Bible-based, traditional, orthodox Christian views of sexuality and the roles of men and women in family and society.

Appellees allow other religious and secular programs which do not include Schmitt's specific religious beliefs, including other Christian programs, to operate

---

[60] J.App.Vol.1 136; R.Doc. 22; Rebertus Decl. ¶14 (emphasis added).

at MCF.[61] In August 2023, right after Quest was canceled, these programs included "the old Norse paganism Ásatrú," "Catholic Mass," "Jumuah Prayer" for the Islamic faith, "Native Sweatlodge," and "Rock of Ages" for Seventh Day Adventists.[62]

Appellees have thus created and enforced against Schmitt a written policy or unwritten custom or practice which limits religious programming to only those programs which agree with the DOC's views of human sexuality and the roles of men and women in society, and intentionally excludes programming which includes Schmitt's Bible-based, mainstream Christian beliefs expressed through Quest.[63]

Schmitt's beliefs expressed through Quest are consistent with orthodox and traditional Christian views of human sexuality and the roles of men and women in society.[64] They are exemplified by, for example, the 2017 Nashville Statement, whose 24,000-plus signatories include leading figures in American evangelical Christian churches.[65] John Piper, the chancellor of the Bethlehem College & Seminary and founder of Bethlehem Baptist Church in Minneapolis, has also expressed similar

---

[61] J.App.Vol.1 136; R.Doc. 22; Rebertus Decl. ¶13.

[62] J.App.Vol.1 102; R.Doc. 17-1; Dornbush Decl., Ex. A at 1.

[63] J.App.Vol.1 81-82; R.Doc.16; Schmitt Decl. ¶¶57-59.

[64] J.App.Vol.1 81; R.Doc. 16; Schmitt Decl. ¶54.

[65] J.App.Vol.1 15-16, R.Doc. 1; Compl. ¶76-77.

Appellate Case: 24-2707     Page: 31     Date Filed: 10/21/2024 Entry ID: 5448190

views about the roles of men and women in society, human sexuality, and same-sex relationships.[66]

Appellees simply disagree with these views, and likewise Schmitt's. They expressly shut down Quest because it teaches Schmitt's beliefs that men and women have complementarian roles in family and society, that men occupy a particular role in family and society, and that same-sex attraction does not require men or women to engage in same-sex relationships.[67] In other words, Appellees shut down Quest and Schmitt because they disagree with and intentionally discriminate against traditional, Bible-based, mainstream Christian religious beliefs.[68] Appellees thus targeted Schmitt because of his religious beliefs.[69]

## VIII. Appellees are responsible for their actions in shutting down Quest and setting DOC policy.

As evidenced by Rebertus's letter, Appellees are responsible for the policies of the DOC enforced against Schmitt and Quest, including the "diversity, equity, and inclusion" values mentioned by Rebertus in her July 10, 2023 email to Schmitt. As Commissioner of the DOC, Appellee Paul Schnell has "control and supervision of" the DOC. Minn. Stat. §241.01, subd. 1. He is likewise responsible for

---

[66] J.App.Vol.1 17-18; R.Doc. 1; Compl. ¶78.

[67] J.App.Vol.1 91; R.Doc. 16-2; Schmitt Decl., Ex. B at 3.

[68] J.App.Vol.1 81-82; R.Doc. 16; Schmitt Decl. ¶¶56-59.

[69] J.App.Vol.1 82; R.Doc. 16; Schmitt Decl. ¶¶59-60.

Appellate Case: 24-2707   Page: 32   Date Filed: 10/21/2024 Entry ID: 5448190

"administer[ing], maintain[ing], and inspect[ing] all state correctional facilities." *Id.* subd. 3a(d). MCF is under Schnell's "control and management." *Id.* §243.75. While Schnell can "delegate," all employees maintaining and administering prisons within the DOC are "subject to the commissioner's control and the conditions the commissioner prescribes." *Id.* §241.01, subd. 3a(h). The legislature has expressly forbidden the commissioner from interfering with the religious exercise of the inmates. *Id.* §241.05. And the legislature has expressly required "spiritual and faith-based programming" for inmates. *Id.* §244.03, subd. 1(a)(5).

### IX. Appellees' actions irreparably harm Schmitt and the inmates Schmitt wishes to serve.

Appellees' actions have harmed Schmitt in two ways, both of which violate his First Amendment rights and thus constitute irreparable harm. First, because Schmitt can no longer facilitate Quest in MCF absent an injunction from this Court. And second, Appellees have harmed Schmitt's dignity by violating his constitutional rights and thus treating him as a lesser member of society than others with different viewpoints. Additionally, Appellees are harming inmates who would, if they had the opportunity, attend and even facilitate the Quest program alongside Schmitt.[70]

---

[70] J.App.Vol.1 83; R.Doc. 16; Schmitt Decl. ¶¶64-66.

Appellate Case: 24-2707     Page: 33     Date Filed: 10/21/2024 Entry ID: 5448190

## X.   Procedural posture.

Schmitt brought this motion for a preliminary injunction on March 8, 2024.[71] The district court heard the motion on July 10, 2024. The court denied Schmitt's motion on August 22, 2024,[72] and he timely appealed the same day.[73]

---

[71] J.App.Vol.1 37-38; R.Doc. 13; Pl.'s Mot. for a Preliminary Injunction.

[72] J.App.Vol.2 269; R.Doc. 38 at 12; Add. 12.

[73] J.App.Vol.2 270; R.Doc. 39; Notice of Appeal.

Appellate Case: 24-2707     Page: 34     Date Filed: 10/21/2024 Entry ID: 5448190

## SUMMARY OF THE ARGUMENT

Appellees cancelled Quest because of Schmitt's religious beliefs, meaning that their decision is subject to the strictest scrutiny under the law. *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 525 (2022); *Fulton v. City of Phila.*, 593 U.S. 522, 540–41 (2021); *Masterpiece Cakeshop, Ltd. v. Colo. Civil Rights Comm'n*, 584 U.S. 617, 638–40 (2018); *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449, 462 (2017); *Church of Lukumi Babalu Aye v. City of Hialeah*, 508 U.S. 520, 532 (1993). These cases control here, and strict scrutiny applies. Schmitt will thus easily demonstrate a "fair likelihood of success on the merits" of the case. And Appellees cannot demonstrate *any* harm to any interests they claim by reinstating the class because it is entirely voluntary, even if wildly popular.

Schmitt should not have to wait years for the final resolution of this case before the Quest program is reinstated. He therefore asks this Court to issue a preliminary injunction requiring reinstatement now pending final adjudication of this case.

## ARGUMENT

### I.    Standard of Review.

This appeal comes from the denial of Appellant's motion for a preliminary injunction under Federal Rule of Civil Procedure 65. This Court reviews "a district court's ultimate ruling on a preliminary injunction for abuse of discretion, though [the appellate court] review[s] its underlying legal conclusions de novo." *Principal*

26

*Sec., Inc. v. Agarwal*, 23 F.4th 1080, 1083 (8th Cir. 2022) (internal quote omitted). "An abuse of discretion occurs where the district court rests its conclusion on clearly erroneous factual findings or erroneous legal conclusions." *Minn. Citizens Concerned for Life, Inc. v. Swanson*, 692 F.3d 864, 870 (8th Cir. 2012) (internal quote omitted).

To obtain a preliminary injunction, "[a] plaintiff . . . must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Tumey v. Mycroft AI, Inc.*, 27 F.4th 657, 664 (8th Cir. 2022) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)); *see Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 113 (8th Cir. 1981) (en banc).

The first factor "is the most significant." *Carson v. Simon*, 978 F.3d 1051, 1059 (8th Cir. 2020). In a First Amendment case, "[w]hen a plaintiff has shown a likely violation of his or her First Amendment rights, the other requirements for obtaining a preliminary injunction are generally deemed to have been satisfied." *Minn. Citizens Concerned for Life*, 692 F.3d at 870 (quoting *Phelps-Roper v. Troutman*, 662 F.3d 485, 488 (8th Cir. 2011) (per curiam)). A "fair chance of prevailing" does ***not*** mean "a 'greater than fifty percent likelihood' of success." *Sleep No. Corp. v. Young*, 33 F.4th 1012, 1016-17 (8th Cir. 2022) (quoting *D.M. ex rel. Bao Xiong v. Minn.*

27

*State High Sch. League*, 917 F.3d 994, 999 (8th Cir. 2019)). Instead, a plaintiff "must show that its claims provide 'fair ground for litigation'" when he is not challenging a duly enacted statute. *Id.* (quoting *Watkins Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003)).

## II.  Schmitt has demonstrated a fair chance of prevailing on the merits.

"[T]he burdens at the preliminary injunction stage track the burdens at trial." *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S.418, 429 (2006). Thus, where First Amendment scrutiny applies, regardless of the standard, it is the government defendant which bears the burden. *Id.* Plaintiff has a First Amendment "guarantee that our laws be applied in a manner that is neutral toward religion." *Masterpiece Cakeshop*, 584 U.S. at 640; *see also Kennedy*, 597 U.S. at 523-24 (2022) (explaining that the "First Amendment doubly protects religious speech" under the Free Speech Clause); *Larson v. Valente*, 456 U.S. 228, 246 (1982) ("[G]overnment must be neutral when it comes to competition between the sects." (quoting *Zorach v. Clauson*, 343 U.S. 306, 314 (1952))). Appellees' decision to cancel Quest was anything but, and so Appellees must carry a massive burden.

The district court held that "[t]he merits of this case hinge almost entirely on the level of scrutiny."[74] Appellees resist their burden by claiming that under *Turner*, their

---

[74] J.App.Vol.2 261; R.Doc. 38 at 4; Add. 4.

Appellate Case: 24-2707    Page: 37    Date Filed: 10/21/2024 Entry ID: 5448190

decision to cancel the quest program need only be "rationally related to legitimate penological interests." *Turner v. Safley*, 482 U.S. 78, 89 (1987). Actions *targeting* non-inmates based on *their* religious beliefs and speech, however, are not evaluated under *Turner*.

And if *Turner* applies, it is not a rubberstamp, *Bear v. Kautzky*, 305 F.3d 802, 805 (8th Cir. 2002) (affirming grant of preliminary injunction under *Turner* based of "the lack of evidence from defendants"), and Appellees still bear the burden of proving rationality **and** neutrality, *Sisney v. Kaemingk*, 15 F.4th 1181, 1190 (8th Cir. 2021).

In sum, no matter how this case is evaluated, Schmitt is likely to prevail, and certainly has a fair chance of prevailing, on the merits. *Wildhawk Invs., LLC v. Brava I.P., LLC*, 27 F.4th 587, 593 (8th Cir. 2022).

### A. To avoid an injunction, Appellees must carry the heavy burden to show that canceling Quest was justified by a compelling interest and was narrowly tailored in pursuit of that interest.

Appellees meant what they said: Schmitt and Quest were kicked out of MCF because Schmitt's "biblical lens" "directly conflicts with the diversity, equity, and inclusivity values of the department."[75] In doing so, Appellees violated the "fixed star in our constitutional constellation . . . that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion." *W.*

---

[75] J.App.Vol.1 91; R.Doc. 16-2; Schmitt Decl., Ex. B at 3.

*Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943). At MCF, only what Appellees declare orthodox is welcome. Unfortunately for Schmitt—and the inmates at MCF—this "denominational preference" means that Quest no longer makes the cut.

The First Amendment, and its three "complementary" clauses—Free Exercise, Free Speech, and Establishment—are designed to prevent such hostile treatment of religious speech. Therefore, Appellees must demonstrate that their cancellation of the Quest program was narrowly tailored to achieve "interests of the highest order." *Fulton*, 593 U.S. at 541 (quoting *Lukumi*, 508 U.S. at 546). But because their anti-Christian animus is clear—they find Schmitt's views on male and female roles in family society to be offensive—they "cannot begin to satisfy strict scrutiny." *Masterpiece Cakeshop*, 584 U.S. at 644 (Gorsuch, J., concurring). There is simply no government interest in censoring religious speech about millennia-old mainstream Christian teaching about human sexuality. Appellees also clearly had a less restrictive means of achieving any interest in not exposing inmates to ideas they don't like: let Quest continue to be offered voluntarily, so that inmates can simply avoid the class if they so choose. Instead, Appellees have discriminated against Schmitt using their "diversity, equity, and inclusion" values, which are neither neutral nor generally applicable. This discrimination based on viewpoint is forbidden under the First Amendment, and the Court should so hold.

1.  Appellees burdened Schmitt's sincere religious practice by target-
    ing his religious beliefs pursuant to a policy that was neither neu-
    tral nor generally applicable.

The Free Exercise Clause "does perhaps its most important work by protecting the ability of those who hold religious beliefs of all kinds to live out their faiths in daily life through 'the performance of (or abstention from) physical acts.'" *Kennedy*, 597 U.S. at 524 (quoting *Emp. Div. v. Smith*, 494 U.S. 872, 877 (1990)). When a government actor burdens that ability "pursuant to a policy that is not 'neutral' or 'generally applicable,' . . . the Court will find a First Amendment violation unless the government can satisfy 'strict scrutiny.'" *Id.* at 525 (first quoting *Smith*, 494 U.S. at 879-81, and then quoting *Lukumi*, 508 U.S. at 546).

First, "[g]overnment fails to act neutrally when it proceeds in a manner intolerant of religious beliefs or restricts practices because of their religious nature." *Fulton*, 593 U.S. at 533; *see also Trinity Lutheran*, 582 U.S. at 466 n.4 ("[A] law targeting religious beliefs is never permissible." (quoting *Lukumi*, 508 U.S. at 533)). In *Trinity Lutheran*, Missouri disqualified religious organizations from receiving grants for rubber playground surfaces made from recycled tires. 582 U.S. at 453-54. As the Court explained, that policy "expressly discriminate[d] against otherwise eligible recipients by disqualifying them from a public benefit solely because of their religious character." *Id.* at 462. The State could not require the church "to renounce its

31

religious character in order to participate in an otherwise generally available public benefit program, from which it is fully qualified." *Id.* at 463-66.

*Trinity Lutheran* may have been an easy case. The state was discriminating against *all* entities with a "religious character." *Id.* at 462. But the Court made clear that the First Amendment goes even further: the State "may not discriminate against 'some or all religious beliefs.'" *Id.* at 461 (quoting *Lukumi*, 508 U.S. at 532). In other words, the case would have been the same if the State only allowed Catholic churches, Lutheran churches, or churches that preach state-endorsed views to apply for recycled playground tires.

Indeed, even "subtle departures from neutrality" are offensive to the Constitution. *Masterpiece Cakeshop*, 584 U.S. at 638 (quoting *Lukumi*, 508 U.S. at 534). Any "hostility to a religion or religious viewpoint" is prohibited by the First Amendment, whether it comes in the form of excluding religious exercise from publicly accessible programs, or any other action "that passes judgment upon or presupposes the illegitimacy of religious beliefs and practices." *Id.*

Appellees' treatment of Schmitt certainly departed from neutrality, and it was far from subtle. Start with Rebertus's letter canceling Quest. That letter stated that "[t]he [Quest] program directly conflicts with the diversity, equity, and inclusivity values of the department by defining manhood, or the study of masculinity, *through a*

*biblical lens* of what a 'real man looks like.'"[76] Further, the letter characterized Quest's Bible-centered Christian approach as "teach[ing] participants about manhood through a lens of discrimination, exclusivity, gender biases and stereotypes."[77]

The same hostility continued throughout this litigation. Appellees' briefing below characterizes the Quest program, through which Schmitt expresses *his* sincere religious beliefs, as "problematic content," that "promote[s] negative beliefs about certain groups of people."[78] Rebertus's declaration asserts that "Quest's content devalues women and LGBTQ+ individuals," contains "stereotypes," and "promote[s] negative beliefs about certain groups of people."[79] And at the hearing, Appellees' counsel claimed it was "a little peculiar" that Schmitt wants to use a "24-part DVD set" from "the Internet."[80] Schmitt's desire to use a program consistent with his religious beliefs,[81] that worked successfully as the "premier religious program" at MCF for over decade,[82] is now, according to Appellees, "a little narrow-minded."[83]

---

[76] J.App.Vol.1 91; R.Doc. 16-2, Schmitt Decl., Ex. B at 3 (emphasis added).

[77] *Id.*

[78] J.App.Vol.1 113, 123; R.Doc. 21; Defs.' Mem. 7, 17.

[79] J.App.Vol.1 133-35; R.Doc. 22; Rebertus Decl. ¶¶11-12.

[80] Tr. 33:5-8.

[81] J.App.Vol.1 81; R.Doc. 16; Schmitt Decl. ¶54.

[82] J.App.Vol.1 99, R.Doc. 17; Dornbush Decl. ¶14.

[83] Tr. 33:14.

33

Even the district court's order declared that Quest "include[s] homophobic content," despite that phrase never appearing in any of Appellees' filings.[84] At every turn the government has been "neither tolerant nor respectful of [Schmitt's] religious beliefs." *Masterpiece Cakeshop*, 584 U.S. at 639.

If local police shut down a church because "problematic content" was taught, the First Amendment violation would be obvious. The same would be true if Minnesota outlawed communion because the practice is "a little narrow-minded." The First Amendment was "designed" to prevent such crusades. *See Barnette*, 319 U.S. at 641. The "general principles here do not permit discrimination against religious exercise—whether on the playground[,]" in a volunteer prison ministry, "or anywhere else." *Trinity Lutheran*, 582 U.S. at 470 (Gorsuch, J., concurring in part).

Moreover, Appellees' "diversity, equity, and inclusivity" values "'invite[]' the government to consider the particular reasons for a person's conduct by providing 'a mechanism for individualized exemptions'" and therefore lack general applicability. *Fulton*, 593 U.S. at 533 (quoting *Smith*, 494 U.S. at 884). In *Fulton*, the City's "sole discretion" to grant an exemption to its discrimination policy meant it could not refuse to extend one to Catholic Social Services. *Id.* at 534. Likewise, the State's "good cause" standard for unemployment benefits in *Sherbert* "invite[d]"

---

[84] J.App.Vol.2 259; R.Doc. 38 at 2; Add. 2.

Appellate Case: 24-2707     Page: 43     Date Filed: 10/21/2024 Entry ID: 5448190

consideration of why an individual was unemployed—and allowed the State to determine if a religious reason was good enough—meaning denial for a religious reason "could only be justified by a compelling interest." *Id.* at 533-34 (discussing *Sherbert v. Verner*, 374 U.S. 398 (1963)).

The same is true here. "There is no formal written DEI policy" at MCF.[85] Instead, Appellees claim discretion to review religious programs and pick and choose "the ones that make the most sense with their values."[86] "DEI" can mean whatever Appellees want—they have claimed nearly limitless discretion to evaluate religious beliefs and decide which ones "fit" within their free-floating values. Some religious views—like "the old Norse paganism," "Catholic Mass," and "Jumuah Prayer" for the Islamic faith—have made the cut.[87] On the other hand, Appellees have decided there is no "good cause" for Quest to operate. The First Amendment does not tolerate the picking and choosing of religious winners and losers.

Furthermore, Appellees must, under Minnesota law, open MCF to "spiritual and faith-based programming." Minn. Stat. §244.03, subd. 1(a)(5). Now that Appellees have welcomed some community members into MCF to teach faith-based programs, they must administer such a program in a neutral and generally applicable manner.

---

[85] Tr. 23:12-14.

[86] Tr. 30:15-19.

[87] J.App.Vol.1 102; R.Doc. 17-1; Dornbush Decl., Ex. A at 1.

Individuals do not have a First Amendment right to get government-sponsored recycled tires, but they do have a right not to be excluded from the program because of religion. *Trinity Lutheran*, 582 U.S. at 462. And there is no First Amendment right to get a government contract for foster-child placement, but there is a right not to be singled out for exclusion because of religious exercise. *Fulton*, 593 U.S. at 535. Allowing some state-approved religious groups to operate, while canceling and disparaging Schmitt's Quest program similarly violates the First Amendment.

## 2.  Appellees engaged in egregious viewpoint discrimination.

The exclusion of Schmitt and his Quest program from MCF simply because he expressed disfavored religious views likewise violates the Free Speech Clause. *See Kennedy*, 597 U.S. at 523 ("Where the Free Exercise Clause protects religious exercises, whether communicative or not, the Free Speech Clause provides overlapping protection for expressive religious activities."). Indeed, "a free-speech clause without religion would be Hamlet without the prince." *Capitol Square Rev. & Advisory Bd. v. Pinette*, 515 U.S. 753, 760 (1995).

 As a result, Appellees may not discriminate against Schmitt's "unpopular" (to Appellees only in MCF, apparently) religious views or deny him access to a government benefit unless he "toes the company line" for the DOC. *See Connick v. Myers*, 461 U.S. 138, 144 (1983). The government "may not deny a benefit to a person on a basis that infringes his constitutionally protected . . . freedom of speech even if he has no

Appellate Case: 24-2707     Page: 45     Date Filed: 10/21/2024 Entry ID: 5448190

entitlement to that benefit." *Agency for Int'l Dev. v. Alliance for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 214 (2013) (quoting *Rumsfeld v. FAIR*, 547 U.S. 47, 59 (2006)). That protection extends to "the opportunity to serve as a volunteer." *Hyland v. Wonder*, 972 F.2d 1129, 1135 (9th Cir. 1992); *see also Mosely v. Bd. of Educ.*, 434 F.3d 527, 534-35 (7th Cir. 2006). And access to government facilities, *see Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 112 (2001), or any other state-sponsored forum, *see Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 829 (1995); *InterVarsity Christian Fellowship/USA v. Univ. of Iowa*, 5 F.4th 855, 863-64 (8th Cir. 2021).

"[F]orum analysis is the default means of evaluating speech restrictions" in all of these settings—even in a "county jail's volunteer ministry program." *Jarrard v. Sheriff of Polk Cnty.*, No. 23-10332, 2024 U.S. App. LEXIS 23482, at *1, *13 (11th Cir. Sept. 16, 2024); *see also Cajune v. Ind. Sch. Dist. 194*, 105 F.4th 1070, 1082 (8th Cir. 2024). Appellees created a limited public forum by allowing numerous other groups to speak at MCF—and they are even statutorily obligated to do so.[88] And yet in *all* forums, "regulation of speech based on the speaker's viewpoint is presumptively invalid, and must, at the very least, satisfy strict scrutiny." *Jarrard*, 2024 U.S. App. LEXIS 23482, at *18; *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015); *see also*

---

[88] J.App.Vol.1 64; R.Doc. 15; Pl.'s Mem. Supp. Mot. for Preliminary Injunction at 26.

37

*Cajune*, 105 F.4th at 1082-83 ("[I]n a limited public forum, a government is prohibited from discriminating against speech on the basis of its viewpoint."); *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 46 (1983) (holding, in a nonpublic forum, the State may not "suppress expression merely because public officials oppose the speaker's view").

Appellees shut down Quest because of Schmitt's viewpoint. Rebertus said so clearly: Schmitt's "*biblical lens*"—his viewpoint itself—was the offending component of his speech.[89] Moreover, Rebertus declared that "Quest teaches participants about manhood though a *lens* of discrimination, exclusivity, gender biases and stereotypes."[90] Criticism of the "lens" through which a person discusses an issue might as well be the dictionary definition of viewpoint discrimination. *See Rosenberger*, 515 U.S. at 829 ("The government must abstain from regulating speech when the specific motivating ideology or the opinion *or perspective* of the speaker is the rationale for the restriction." (emphasis added)).

The Eleventh Circuit's recent decision in *Jarrard* helps explain why. There, a county jail volunteer "believes that baptism by immersion is necessary to salvation and that, without it, a person will be condemned to Hell." 2024 U.S. App. LEXIS 23482, at *3. Jail officials disagreed and removed him from the volunteer program.

---

[89] J.App.Vol.1 91; R.Doc. 16-2; Schmitt Decl., Ex. B at 3 (emphasis added).

[90] *Id.* (emphasis added).

Appellate Case: 24-2707     Page: 47     Date Filed: 10/21/2024 Entry ID: 5448190

*Id.* at *3-6. The reason: "[he] had to stop teaching about baptism if he wanted to remain in the program." *Id.* at *5.

Later, jail officials argued that their actions were not *viewpoint discrimination* but "an appropriate *content-based* restriction on messages that specifically agitate inmates." *Id.* at *21. In defense of that argument, the jail identified a list of teachings they took issue with: "(1) persons who *are* baptized through full immersion *will* go to Hell; (2) persons with a tattoo(s) will go to Hell; or (3) persons who take medications will go to Hell." *Id.* The Eleventh Circuit was not persuaded. Those examples "indicate that while they will permit discussions that don't mention Hell, or even of things that won't land one in Hell, they won't tolerate discussion of things that will result in damnation. That, it seems to us, is viewpoint discrimination, pure and simple." *Id.* at *22.

Appellees' policing of the Quest program is identical. Rebertus's July 2023 letter listed out the "unapproved" teachings in the Quest program. Consistent with Appellees' free-floating values, teaching about "heterosexual relationships" or the biblically "ideal marriage" is not approved.[91] Or, as put by Appellees' counsel, the DOC picks the programs "that make the most sense with their values."[92] Deciding which religious

---

[91] J.App.Vol.1 91; R.Doc. 16-2; Schmitt Decl., Ex. B at 3.
[92] Tr. 30:15-19.

Appellate Case: 24-2707     Page: 48     Date Filed: 10/21/2024 Entry ID: 5448190

programs promote the "right" values, and excluding Schmitt because he is the "wrong" kind of Christian "is viewpoint discrimination, pure and simple."

3. Appellees engaged in obvious denominational preference in violation of the Establishment Clause.

The First Amendment protects Schmitt in a third way. "The Establishment Clause and Free Exercise Clause work together to safeguard the freedom of our people." *Ray v. Comm'r, Ala. Dep't of Corr.*, 915 F.3d 689, 696 (11th Cir. 2019), *stay vacated*, *Dunn v. Ray*, 139 S. Ct. 661 (2019) (vacating the stay because the inmate waited almost three months to seek relief). If government programs are neutral, the Establishment Clause is not offended. *See Rosenberger*, 515 U.S. at 839. Indeed, "the guarantee of neutrality is respected, not offended, when the government, following neutral criteria and evenhanded policies, extends benefits to recipients whose ideologies and viewpoints, including religious ones, are broad and diverse." *Id.*; *see Child Evangelism Fellowship of Minn. v. Minneapolis Special Sch. Dist. No. 1*, 690 F.3d 996, 1003 (8th Cir. 2012) ("[T]he Establishment Clause requires neutrality, as opposed to hostility, towards religion.").

When Appellees fail to act neutrally, as they have in this case, however, the "clearest command of the Establishment Clause" is violated: "one religious denomination cannot be officially preferred over another." *Larson*, 456 U.S. at 244. "[W]hen it is claimed that a denominational preference exists, the initial inquiry is whether the law facially differentiates among religions." *Hernandez v. Comm'r*, 490

40

U.S. 680, 695 (1989). If it does, then courts automatically "treat the law as suspect" and "apply strict scrutiny." *Larson*, 456 U.S. at 246.

Facial denominational preference can come in many forms. In *Larson*, it was "a Minnesota statute, imposing certain registration and reporting requirements upon only those religious organizations that solicit more than fifty per cent of their funds from nonmembers" which effectively prioritized "well-established" churches over "churches which are new and lacking in a constituency." *Id.* at 230, 246 n.23. In other cases, it may be a statute exempting from union membership "only those employees who are members of a 'bona fide' religious organization," *Wilson v. NLRB*, 920 F.2d 1282, 1287 (6th Cir. 1990), a state law providing college scholarships, as long as the state did not deem the college "pervasively sectarian," *Colo. Christian Univ. v. Weaver*, 524 F.3d 1245, 1258 (10th Cir. 2008), or a prison allowing inmates to have a Christian or Muslim religious advisor present in the execution room, but not an advisor of another religious denomination, *Murphy v. Collier*, 139 S. Ct. 1111, 1112 (2019) (Kavanaugh, J., concurring in grant of application for stay); *see also Ray*, 915 F.3d at 696.

Here, the denominational preference is obvious. Appellees demonstrate "favoritism among sects," *Sch. Dist. of Abington Twp. v. Schempp*, 374 U.S. 203, 305

41

(1963), by allowing other religious groups to operate at MCF,[93] but blocking the dissemination of Schmitt's mainstream, traditional Christian religious beliefs. Or rather, Schmitt is free to volunteer at MCF, but only if he adheres to one of Appellees' preferred denominations—a classic violation of the Establishment Clause.[94]

### 4. Appellees cannot satisfy strict scrutiny.

For all of these reasons, Appellees actions are "examined under the strictest scrutiny" and "can survive such scrutiny only if it advances 'interests of the highest order' and is narrowly tailored to achieve those interests." *Fulton*, 593 U.S. at 541 (quoting *Lukumi*, 508 U.S. at 546); *see Kennedy*, 597 U.S. at 531-32 ("Whether one views the case through the lens of the Free Exercise or Free Speech Clause, at this point the burden shifts to the [defendant]."); *Larson*, 456 U.S. at 247 (holding that when denominational preference is at issue, "the rule must be invalidated unless it is justified by a compelling governmental interest . . . and unless it is closely fitted to further that interest"). "[S]o long as the government can achieve its interests in a manner that does not burden religion, it must do so." *Fulton*, 593 U.S. at 541.

Appellees bear the burden here, *see Ashcroft v. ACLU*, 542 U.S. 656, 666 (2004), and have so far made no attempt to meet it. At most, Appellees have argued that

---

[93] J.App.Vol.1 102; R.Doc. 17-1; Dornbush Decl., Ex. A at 1. J.App.Vol.1 136; R.Doc. 22; Rebertus Decl. ¶13.

[94] J.App.Vol.1 115; R.Doc. 21; Defs.' Mem. at 9 ("Schmitt is free to apply to teach a different program at a DOC prison.").

Appellate Case: 24-2707     Page: 51     Date Filed: 10/21/2024 Entry ID: 5448190

canceling the Quest program furthers its interests in reducing recidivism and ensuring safety and security in MCF facilities.[95] As the district court correctly held, however, Rebertus's letter terminating the Quest program raised only rehabilitation concerns.[96] *See Kennedy*, 597 U.S. at 543 n.8 ("Government 'justification[s]' for interfering with First Amendment rights 'must be genuine, not hypothesized or invented *post hoc* in response to litigation." (quoting *United States v. Virginia*, 518 U.S. 515, 533 (1996))).

And that interest has only been asserted "at a high level of generality." *Fulton*, 593 U.S. at 541. Courts do not allow "broadly formulated interests" to trump First Amendment rights. *Id.* Instead, they "scrutinize[] the asserted harm of granting specific exemptions to particular religious claimants." *Id.* (quoting *O Centro*, 546 U.S. at 431). In other words, the question is not whether Appellees have an interest in reducing rehabilitation generally, but whether they have such an interest in refusing to accommodate Schmitt's Quest program. *See id.*

The problem for Appellees, however, is that inmate participation in the Quest program is, has been, and always will be entirely voluntary.[97] As the Eleventh Circuit in *Jarrard* held, one potentially less restrictive alternative to canceling a volunteer's

---

[95] J.App.Vol.1 119-20; R.Doc. 21; Defs.' Mem. at 13-14.

[96] J.App.Vol.2 264; R.Doc. 38 at 7; Add. 7.

[97] J.App.Vol.1 75; R.Doc. 16; Schmitt Decl. ¶21. J.App.Vol.1 97; R.Doc. 17; Dornbush Decl. ¶7.

ministry application was for "the Jail [to] post[] notices stating that [the volunteer] would be addressing a potentially contentious topic and let the inmates decide whether they wanted to attend." 2024 U.S. App. LEXIS 23482, at *22. Even in controlled settings like a jail, there are ample alternatives to pure paternalism. *See Kennedy*, 597 U.S. at 538 ("[L]earning how to tolerate speech or prayer of all kinds is 'part of learning how to live in a pluralistic society,' a trait of character essential to 'a tolerant citizenry.'" (quoting *Lee v. Weisman*, 505 U.S. 577, 590 (1992))).

In short, Appellees have no legitimate interest in singling out Schmitt's religious beliefs for censorship using a free-floating "DEI values" card. And Appellees cannot show that canceling the Quest program—as opposed to allowing it to continue to be voluntary for inmates—was the means least restrictive of Schmitt's rights to achieving any claimed interest. Under strict scrutiny, the Court should hold that Schmitt is likely to succeed on the merits and issue an injunction.

## B. The *Turner* test does not apply to this case.

The district court sidestepped First-Amendment scrutiny and incorrectly concluded that the *Turner* standard applies. In *Turner*, the Supreme Court held that "[w]hen a prison regulation impinges on *inmates' constitutional rights*, the regulation is valid if it is reasonably related to legitimate penological interests." *Turner*, 482 U.S. at 89 (emphasis added). As a result, constitutional claims "are evaluated

44

under a lesser standard of scrutiny" than "if raised by a member of the general population." *Murphy v. Mo. Dep't of Corr.*, 372 F.3d 979, 982 (8th Cir. 2004).

To be sure, the Supreme Court later held that *Turner* applied to "regulations affecting the sending of a 'publication' . . . to a prisoner" by a non-prisoner. *Thornburgh v. Abbott*, 490 U.S. 401, 413 (1989). The case was brought by both inmates *and* their non-prisoner correspondents. *Id.* at 403. And the prison regulation "implicate[d] the rights of outsiders," but was targeted at the inmates. *Id.* at 404-405, 410 n.9. In other words, the rights implicated (but not directly targeted) by the regulation were of a "correlative nature . . . in the absence of a prison regulation to the contrary, prisoners have the right to receive, and outsiders have a correlative right to send, unsolicited communications." *Prison Legal News v. Livingston*, 683 F.3d 201, 214 (5th Cir. 2012). Viewed in this light, the holding in *Thornburgh* makes sense. It would be quite difficult for courts to, *in the same case*, uphold a regulation based on its impact on prisoners' rights, but then strike it down because of the outsider's incidentally burdened rights.

But *Thornburgh* was not as broad as the district court claimed.[98] Rather, the Court cabined its holding to "any attempt to forge separate standards for cases *implicating* the rights of outsiders," and *only* relied on cases concerning regulations targeted at

---

[98] J.App.Vol.2 262; R.Doc. 38 at 5; Add. 5.

Appellate Case: 24-2707     Page: 54     Date Filed: 10/21/2024 Entry ID: 5448190

inmates, with an incidental burden on non-inmates' rights. *Thornburgh*, 490 U.S. at 410 n.9 (emphasis added); *Pell v. Procunier*, 417 U.S. 817, 819, 835 (1974) (up-holding media interview policy in lawsuit brought by inmates and members of the media); *Jones v. N.C. Prisoners' Labor Union, Inc.*, 433 U.S. 119, 121 (1977) (up-holding ban on inmate solicitation and group meetings which restricted inmates' right to join an inmate labor union).

As a result, "[t]he Supreme Court has never applied *Turner* in a case such as this one, where the regulation promulgated by prison officials is centrally concerned with restricting the rights of outsiders rather than prisoners." *Cal. First Amend. Coal. v. Woodford*, 299 F.3d 868, 878 (9th Cir. 2002); *see Human Rights Def. Ctr. v. Baxter Cnty. Ark.*, 999 F.3d 1160, 1165 (8th Cir. 2021) ("The Court has not considered the extent to which a ban on access to inmates may violate the separate First Amendment rights of outsiders, including publishers."). Nor has, to Appellant's knowledge, the Eighth Circuit. Indeed, the decision below is an anomaly. Appellees cited no support, and Appellant has found none, for the conclusion that *Turner* applies to prison reg-ulations which single out outsiders based on religious speech. *See Jarrard*, 2024 U.S. App. LEXIS 23482, at *19-23 (applying strict scrutiny).[99]

---

[99] Notably, although the *Turner* test was applied by the district court in *Jarrard* for separate claims raised by an inmate, the Eleventh Circuit did not even bother men-tioning it on appeal when the case concerned *only* the First Amendment claims of

And for good reason. Even for inmates, the application of *Turner* has been limited "*only* to rights that are 'inconsistent with proper incarceration'" such as "limits on inmate correspondence" and "work rules limiting prisoners' attendance at religious services," *Johnson v. California*, 543 U.S. 499, 510 (2005) (quoting *Overton v. Bazzetta*, 539 U.S. 126, 131 (2003)), which are essentially neutral time, place, and manner restrictions which would not trigger strict scrutiny anyway, *see Vester v. Rogers*, 795 F.2d 1179, 1183 (4th Cir. 1986) (holding, pre-*Turner*, that mail restriction was a time, place and manner regulation); *Smith*, 494 U.S. at 879 (holding that neutral, generally applicable laws need not be justified by a compelling government interest); *Roe v. Crawford*, 514 F.3d 789, 794 (8th Cir. 2008) ("*Turner* [only] applies to prison restrictions relating to rights *not* typically subject to strict scrutiny."). The district court's rushed conclusion that "courts consistently apply *Turner* to First Amendment challenges,"[100] failed to consider the Supreme Court's warning—time and time again—that "a law targeting religious beliefs is never permissible," *Trinity Lutheran*, 582 at 466 n.4 (quoting *Lukumi*, 508 U.S. at 533).

In other words, just because courts have applied *Turner* to First Amendment cases that fall under *Smith*, when the regulation is neutral and generally applicable,

---

the outside volunteer. *Compare Jarrard v. Moats*, No. 4:20-cv-2, 2021 U.S. Dist. LEXIS 60130, at *12-18 (N.D. Ga. Mar. 30, 2021).

[100] J.App.Vol.2 263; R.Doc. 38 at 6; Add. 6.

Appellate Case: 24-2707   Page: 56   Date Filed: 10/21/2024 Entry ID: 5448190

does not mean they apply *Turner* when the case looks more like *Trinity Lutheran*, *Fulton*, and *Masterpiece Cakeshop*. Neutrality towards religious exercise and speech is *always* required, even in the prison system. That is why the Seventh Circuit in *Emad v. Dodge County* held that "a policy that operates to discriminate against Muslim detainees cannot satisfy *Turner* as a matter of law." 71 F.4th 649, 653 (7th Cir. 2023). The court went on to deny qualified immunity to the jailers, not because they should have known that the policy could not satisfy *Turner*, but because after *Masterpiece Cakeshop* and *Lukumi*, "jailers, absent some extraordinary justifications, cannot treat inmates differently based on religion." *Id.* at 655.

Likewise, the Supreme Court granted a stay of execution in *Murphy v. Collier* because Texas would only allow a Christian or Muslim religious advisor present in the execution room, while inmates of other religious denominations could not have an advisor of their own religion present. 139 S. Ct. at 1111-12 (Kavanaugh, J., concurring in the grant of stay). Justice Kavanaugh's concurrence cited *Trinity Lutheran* and *Larson* in support, not *Turner*. *See id.* (explaining that "government may not discriminate . . . against particular religious denominations" in prisons). Point being, *Turner* is not the correct path when anyone, inmate or outsider, is targeted for non-neutral treatment because of their religious beliefs. *See, e.g.*, *Jarrard*, 2024 U.S. App. LEXIS 23482, at *19-23; *Maisonet v. Comm'r Ala. Dep't of Corr.*, No. 22-10032, 2022 U.S. App. LEXIS 25976, at *11 (11th Cir. Sept. 16, 2022) (suggesting

48

that if a prison minister alleged he was treated less favorably than ministers of other denominations, he could show a violation of clearly established law); *In re Rouse*, No. 21-1523, 2021 U.S. App. LEXIS 25120, at *4 (6th Cir. Aug. 20, 2021) (Thapar, J., concurring) (explaining that "the government cannot treat religious activity worse than any comparable secular activity" in prisons); *Grayson v. Schuler*, 666 F.3d 450, 453-55 (7th Cir. 2012) (declining to apply *Turner* and denying qualified immunity because prison singled out certain religions).

The Supreme Court has already held that *Turner* does not apply to another government action that is always subject to strict scrutiny: racial classifications. *Johnson*, 543 U.S. at 510. The logic of *Johnson* applies here. The Fourteenth Amendment's protection against racial discrimination "is not a right that need necessarily be compromised for the sake of proper prison administration." *Id.* And it is not a right the Supreme Court has permitted to be compromised in other contexts, no matter how much deference state actors are traditionally afforded. *Id.* at 511-12 (explaining that "despite the broad discretion given to prosecutors," preemptory strikes on the basis of race are impermissible and "despite the traditional deference given to States when they design their electoral discretions," redistricting based on race is subject to strict scrutiny). The same is true in the context of government singling out religious viewpoints and speech for uniquely unfavorable treatment. Even though the speech rights of public-school teachers are not unlimited, a school may not

49

punish them for private religious speech, even on the school's football field, right after a school game, among school students. *Kennedy*, 597 U.S. at 527-28. Nor may the government "discriminate against religion when acting in its managerial role," even though it "commands heightened powers when managing its internal operations." *Fulton*, 593 U.S. at 535-36.

Finally, *Turner* does not apply to Establishment Clause claims. *Ams. United for Separation of Church & State v. Prison Fellowship Ministries, Inc.*, 509 F.3d 406, 426 (8th Cir. 2007). In defending their actions, Appellees asserted that MCF offers a variety of *different* Christian-based programs so Schmitt can only volunteer at MCF if he follows its preferred denominations.[101] And there is no escaping strict scrutiny for that claim. *Larson*, 456 U.S. at 246.

> **C.** **Even if *Turner* does apply to this case, Schmitt has demonstrated a likelihood of success on the merits.**

*Turner* provides a "two-step, four-factor test to determine when a regulation that impinges on inmates' constitutional rights is 'reasonably related to legitimate penological interest.'" *Sisney*, 15 F.4th at 1190 (quoting *Turner*, 482 U.S. at 89). "The first factor operates as a threshold condition that the regulation must satisfy to pass constitutional muster." *Id.* If the regulation survives the threshold requirements, the court then must "balanc[e] the remaining three factors." *Id.*

---

[101] J.App.Vol.1 135-36; R.Doc. 22; Rebertus Decl. ¶13.

First, "[w]hen the regulation in question 'restrict[s] inmates' First Amendment rights,' then it must also 'operate[] in a neutral fashion.'" *Id.* (quoting *Turner*, 482 U.S. at 90). In other words, the government's chosen means must be "unrelated to the suppression of expression." *Thornburgh*, 490 U.S. at 415. As the Court explained in *Thornburgh*, regulations that barred writings expressing "inflammatory political, racial, religious or other views . . . fairly invited prison officials and employees to apply their own personal prejudices and opinions as standards for prisoner mail censorship." *Id.* at 415 n.14 (quoting *Procunier v. Martinez*, 416 U.S. 396, 415 (1974)). So those regulations "were decidedly not 'neutral' in the relevant sense." *Id.*[102]

The district court cursorily concluded that Appellees' cancellation of Quest was neutral because it was terminated for teaching "discrimination, exclusivity, gender biases, and stereotypes."[103] Repeatedly, however, courts have rejected policies aimed at suppressing unpopular views, without more. As the Eighth Circuit explained in *Sisney*, "although 'inmate rehabilitation' is a legitimate government interest, . . . a prison may not censor 'literature advocating racial purity' on the ground

---

[102] Appellees also claim the discretion to discontinue programs as inconsistent with their unwritten DEI values. Tr. 30:15-19. Like the regulation struck down in *Shakur v. Selsky*, 391 F.3d 106, 115 (2d Cir. 2004), this discretion "does not provide any standards against which DOCS officials will conduct an individualized review of the publication in question." *See also Jarrard*, 2024 U.S. App. LEXIS 23482, at *29 (holding that the jail's policies violated the unbridled-discretion doctrine).

[103] J.App.Vol.2 265; R.Doc. 38 at 8; Add. 8.

Appellate Case: 24-2707    Page: 60    Date Filed: 10/21/2024 Entry ID: 5448190

that exposure to racist ideas inhibits rehabilitation." 15 F.4th at 1190 (first quoting *Dawson v. Scurr*, 986 F.2d 257, 261 (8th Cir. 1993), and then quoting *McCabe v. Arave*, 827 F.2d 634, 638 (9th Cir. 1987)).

In turn, in *McCabe*, the prison could not ban white supremacist literature, as detestable as it is, because "the officials are regulating on the basis of the content of the literature." 827 F.2d at 638. And while content regulation of books that "encourage violence" may be permissible, "prison authorities have no legitimate penological interest in excluding religious books from the prison library merely because they contain racist views." *Id.* In *Sisney*, in contrast, the prison could censor materials "whose primary purpose is clearly to cause sexual arousal." 15 F.4th at 1192. Notably, the court explained that the policy *was* neutral because "[p]rison officials did not censor the books because they advanced claims about human sexuality that the prison officials deemed subversive and therefore worthy of suppression." *Id.* at 1192-93. In other words, Appellees *can* prohibit content advocating for violence towards women, but they *cannot* prohibit Quest merely because it suggests that men and women have different roles in society and marriage.

Appellees also fail the neutrality test by favoring other Christian denominations over Schmitt's beliefs. Appellees admit as much by stating that other, "acceptable,"

52

Christian programs can operate at MCF.[104] This favoritism of state-endorsed denominations of Christianity "cannot satisfy *Turner* as a matter of law." *Emad*, 71 F.4th at 653 (discussing a policy "that operates to discriminate against Muslim detainees"); *Maye v. Klee*, 915 F.3d 1076, 1084 (6th Cir. 2019) ("Denying an individual a 'reasonable opportunity of pursuing his faith comparable to the opportunity afforded fellow prisoners who adhere to conventional religious precepts' based on his religion of choice is not a valid penological reason." (quoting *Cruz v. Beto*, 405 U.S. 319, 322 (1971))).

Moreover, it is Appellees' burden to prove "a 'rational connection' between the challenged regulation and a legitimate government interest." *Sisney*, 15 F.4th at 1190 (quoting *Murchison v. Rogers*, 779 F.3d 882, 887-88 (8th Cir. 2015)). Unless the connection is obvious based on "common sense," Appellees "must proffer some evidence to support" it. *Id.* at 1191 (quoting *Shimer v. Washington*, 100 F.3d 506, 509-10 (7th Cir. 1996)). It is a far cry from common sense to assert that traditional, mainstream Christian Beliefs, held by law-abiding members of society,[105] and taught at MCF for a decade without incident,[106] somehow have the grave potential to lead to violence. Appellees have no evidence to support their claims that Quest is bad, and

---

[104] J.App.Vol.1 136; R.Doc. 22; Rebertus Decl. ¶13.

[105] J.App.Vol.1 15-18; R.Doc. 1; Compl. ¶¶75-78.

[106] J.App.Vol.1 79; R.Doc. 16; Schmitt Decl. ¶42.

so they cannot satisfy *Turner*'s first factor. Indeed, although courts "recognize and defer to the expertise of prison officials on what is likely to be inflammatory in the prison environment," the Eighth Circuit has denied summary judgment without "specific evidence of why this particular item implicates prison concerns." *Murphy*, 372 F.3d at 986 (denying summary judgment after prison confiscated mail it claimed was "so racially inflammatory as to be reasonably likely to cause violence").

Even moving beyond neutrality and rationality, the remaining *Turner* factors support Schmitt. First, Schmitt does not have alternative means to exercise his right to express his Christian views through Quest. *Sisney*, 15 F.4th at 1191. According to the district court, it was good enough that Schmitt can "volunteer again so long as he adopts a curriculum that comports with the facility's programming requirements."[107] No big deal: just change your religious beliefs. This was clear error. True alternatives under *Turner* must provide the opportunity to communicate Schmitt's "intended message." *Livingston*, 683 F.3d at 219.

Additionally, the alternatives floated by Appellees are "illusory, impractical or otherwise unavailable," so this factor "weigh[s] in" Schmitt's favor. *Human Rights Def. Ctr.*, 999 F.3d at 1165. Even *if* Appellees would allow Schmitt to discuss Quest's materials with inmates in a *one-on-one* capacity, there is plenty of reason to

---

[107] J.App.Vol.2 266; R.Doc. 38 at 9; Add. 9.

Appellate Case: 24-2707     Page: 63     Date Filed: 10/21/2024 Entry ID: 5448190

doubt he would be able to do so in practice. Appellees' visitation policy at MCF, referenced numerous times at oral argument but conveniently left out of Appellees' exhibits, provides that offenders at MCF are only allowed two adult visitors.[108] At bottom, Schmitt is presented with two unconstitutional choices: (1) change your religious views to have access to inmates; or (2) have no practical access to inmates. Even under *Turner*, that is not enough.

Next, Appellees cannot demonstrate that the Quest program has had or would have a negative impact on "guards, inmates, and on the allocation of prison resources generally." *Turner*, 482 U.S. at 90. The district court relied on the alleged "ripple effect" at MCF of the ideas taught in Quest. *Id.*; *see also Murchison*, 779 F.3d at 891. In *Murchison*, however, the Eighth Circuit only credited the ripple effect because "defendants presented specific evidence that this particular publication is likely to have a disruptive and disorderly effect on the prison." *Id.* Appellees have presented no such evidence here, while Schmitt has demonstrated that Quest operated successfully for *over a decade* without incident.[109] And if this Court is to take Appellees at their word that "[t]here is nothing about the material that Mr. Schmitt

---

[108] Minn. Dept. of Corrections Policy 302.100(B)(3), https://mn.gov/doc/assets/302.100%20Visiting_tcm1089-627155.pdf.

[109] J.App.Vol.1 79; R.Doc. 16; Schmitt Decl. ¶42.

55

Appellate Case: 24-2707     Page: 64     Date Filed: 10/21/2024 Entry ID: 5448190

doubt he would be able to do so in practice. Appellees' visitation policy at MCF, referenced numerous times at oral argument but conveniently left out of Appellees' exhibits, provides that offenders at MCF are only allowed two adult visitors.[108] At bottom, Schmitt is presented with two unconstitutional choices: (1) change your religious views to have access to inmates; or (2) have no practical access to inmates. Even under *Turner*, that is not enough.

Next, Appellees cannot demonstrate that the Quest program has had or would have a negative impact on "guards, inmates, and on the allocation of prison resources generally." *Turner*, 482 U.S. at 90. The district court relied on the alleged "ripple effect" at MCF of the ideas taught in Quest. *Id.*; *see also Murchison*, 779 F.3d at 891. In *Murchison*, however, the Eighth Circuit only credited the ripple effect because "defendants presented specific evidence that this particular publication is likely to have a disruptive and disorderly effect on the prison." *Id.* Appellees have presented no such evidence here, while Schmitt has demonstrated that Quest operated successfully for *over a decade* without incident.[109] And if this Court is to take Appellees at their word that "[t]here is nothing about the material that Mr. Schmitt

---

[108] Minn. Dept. of Corrections Policy 302.100(B)(3), https://mn.gov/doc/assets/302.100%20Visiting_tcm1089-627155.pdf.

[109] J.App.Vol.1 79; R.Doc. 16; Schmitt Decl. ¶42.

55

can't share with individuals one on one,"[110] then it would be unreasonable for this Court to simultaneously conclude that the Quest materials would create a dangerous ripple effect at MCF. Both cannot be true.

Finally, "the existence of obvious, easy alternatives may be evidence that the regulation is not reasonable, but is an 'exaggerated response' to prison concerns." *Turner*, 482 U.S. at 90. Instead of addressing potential alternatives, the district court hid from the truth: "Schmitt has not proposed a *de minimis* cost alternative."[111] Schmitt, without prompting, was already fast-forwarding through part of the Quest program after a mere suggestion from the DOC.[112] And Appellees never discussed further alternatives before suddenly canceling Quest.[113] Yet obvious alternatives are apparent: MCF could post "notices stating that [Schmitt] would be addressing a potentially contentious topic and let the inmates decide whether they wanted to attend." *Jarrard*, 2024 U.S. App. LEXIS 23482, at *22. Appellees' refusal to even try demonstrates an exaggerated—and discriminatory—response.

---

[110] Tr. 21:17-18.

[111] J.App.Vol.2 267; R.Doc. 38 at 10; Add. 10.

[112] J.App.Vol.1 78; R.Doc. 16; Schmitt Decl. ¶41.

[113] J.App.Vol.1 80; R.Doc. 16; Schmitt Decl. ¶50.

### III. Schmitt has satisfied the remaining *Dataphase* factors.

"When a plaintiff has shown a likely violation of his or her First Amendment rights, the other requirements for obtaining a preliminary injunction are generally deemed to have been satisfied." *Minn. Citizens Concerned for Life*, 692 F.3d at 870 (internal quote omitted); *see also Rodgers v. Bryant*, 942 F.3d 451, 458 (8th Cir. 2019).

First, "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Roman Catholic Diocese v. Cuomo*, 592 U.S. 14, 19 (2020) (per curiam) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality)). The district court's conclusion that Schmitt has not suffered any First Amendment harm, as discussed above, beggars belief.[114]

Next, "[t]he third and fourth factors for a preliminary injunction—harm to the opposing party and the public interest—merge when the Government is the party opposing the preliminary injunction." *Nken v. Holder*, 556 U.S. 418, 435 (2009). Schmitt has "raised questions serious enough to require litigation," so "ordinarily the injunction should issue." *Fennell v. Butler*, 570 F.2d 263, 264 (8th Cir. 1978). In addition to Schmitt's interest in protecting his First Amendment rights, "it is

---

[114] J.App.Vol.2 267; R.Doc. 38 at 10; Add. 10.

always in the public interest to protect constitutional rights." *Rodgers*, 942 F.3d at 458-49 (internal quote omitted). Appellees' interests are much less weighty.

The district court jumped to conclude that "[w]here Rebertus has determined that the Quest program is inappropriate for the prison environment and detrimental to the rehabilitative mission, the balance of harms and public interest favor Rebertus."[115] That is the wrong way to look at this case. "When applying this factor, the key question is whether the movant's likely harm without a preliminary injunction exceeds the nonmovant's likely harm with a preliminary injunction in place." *Cigna Corp. v. Bricker*, 103 F.4th 1336, 1347 (8th Cir. 2024). There is zero evidence that reinstating the Quest program for the duration of this lawsuit will undermine Appellees' administration of MCF. *see Bear*, 305 F.3d at 805 (rejecting a similar argument when "defendants introduced no evidence justifying the new policy").

Finally, there is no real harm in reinstating a voluntary program which previously operated *without incident for over a decade*. *See Prison Legal News v. Cnty. of Ventura*, No. 14-0773, 2014 U.S. Dist. LEXIS 84575, at \*26-27 (C.D. Cal. June 16, 2014) (granting a preliminary injunction, in part, because defendants had "accepted letter mail in the past" so "rescinding the postcard only policy would not pose an inordinate hardship"). The district court ignored these arguments and instead

---

[115] J.App.Vol.2 268; R.Doc. 38 at 11; Add. 11.

Appellate Case: 24-2707    Page: 67    Date Filed: 10/21/2024 Entry ID: 5448190

exaggerated Appellees potential harms. A preliminary injunction would merely reinstate a previously authorized program. Going forward, the only limitation on Appellees' discretion to run MCF would be to not discriminate against Schmitt during the pendency of this lawsuit.

## CONCLUSION

For the reasons set forth herein, Schmitt respectfully requests that this Court reverse the district court and enter a preliminary injunction in his favor, ordering the Appellees to reinstate the Quest program at MCF St. Cloud pending the full adjudication of this case's merits, and order any other and further relief as appropriate.

Respectfully submitted,

**UPPER MIDWEST LAW CENTER**

Dated:  October 18, 2024

_/s/ Alexandra K. Howell_
Douglas P. Seaton (#127759)
James V. F. Dickey (#393613)
Alexandra K. Howell (#504850)
12600 Whitewater Drive Suite 140
Minnetonka, MN 55343
doug.seaton@umlc.org
james.dickey@umlc.org
allie.howell@umlc.org
(612) 428-7000

**TRUE NORTH LEGAL**

Renee K. Carlson (#389675)
525 Park Street, Suite 460
St. Paul, Minnesota 55103
rcarlson@truenorthlegalmn.org

59

(612) 789-8811

*Attorneys for Appellant*

# CERTIFICATE OF COMPLIANCE

1.      This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 12,977 words.

2.      This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word Version 2409 in Times New Roman font, 14-point.

3.      The brief and addendum have been scanned for viruses and are virus free.

**UPPER MIDWEST LAW CENTER**

Dated:  October 18, 2024          */s/ Alexandra K. Howell*
Douglas P. Seaton (#127759)
James V. F. Dickey (#393613)
Alexandra K. Howell (#504850)
12600 Whitewater Drive, Suite 140
Minnetonka, MN 55343
doug.seaton@umlc.org
james.dickey@umlc.org
allie.howell@umlc.org
(612) 428-7000

**TRUE NORTH LEGAL**

Renee K. Carlson (#389675)
525 Park Street, Suite 460
St. Paul, Minnesota 55103
rcarlson@truenorthlegalmn.org

(612) 789-8811

*Attorneys for Appellant*

## CERTIFICATE OF SERVICE

In accordance with Fed. R. App. P. 25, I hereby certify that I electronically filed this brief with the Clerk of Court for the United States Court of Appeals for the Eighth Circuit by using the CM/ECF system on October 18, 2024. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

**UPPER MIDWEST LAW CENTER**

Dated: October 18, 2024

   */s/ Alexandra K. Howell*
Douglas P. Seaton (#127759)
James V. F. Dickey (#393613)
Alexandra K. Howell (#504850)
12600 Whitewater Drive, Suite 140
Minnetonka, MN 55343
doug.seaton@umlc.org
james.dickey@umlc.org
allie.howell@umlc.org
(612) 428-7000

**TRUE NORTH LEGAL**

Renee K. Carlson (#389675)
525 Park Street, Suite 460
St. Paul, Minnesota 55103
rcarlson@truenorthlegalmn.org
(612) 789-8811

*Attorneys for Appellant*

63