No. 24-2707

# In the United States Court of Appeals for the Eighth Circuit

**ANTHONY SCHMITT,**

*Plaintiff-Appellant,*

v.

**JOLENE REBERTUS, in her official capacity as Assistant Commissioner of the Minnesota Department of Corrections; and PAUL SCHNELL, in his official capacity as Commissioner of the Minnesota Department of Corrections,**

*Defendants-Appellees.*

On Appeal from the United States District Court
for the District of Minnesota
District Court No. 0:24-cv-00034-JRT

**BRIEF *AMICUS CURIAE* OF THE NATIONAL LEGAL FOUNDATION**

*In Support of the Plaintiff-Appellant and Reversal*

Steven W. Fitschen
  (Counsel of Record)
National Legal Foundation
524 Johnstown Road
Chesapeake, Va. 23322
(757) 650-9210
sfitschen@nationallegalfoundation.org

# CORPORATE DISCLOSURE STATEMENT

*Amicus Curiae*, The National Legal Foundation, has not issued shares to the public, and does not have a parent company, subsidiary, or affiliate that has issued shares to the public. Thus, no publicly held company can own more than 10% of stock of *Amicus Curiae*.

Table of Contents

Table of Authorities...........................................................................................iiii

Statement of Interest .........................................................................................1

Summary of the Argument................................................................................1

Argument...........................................................................................................1

    I.   *Turner*, Like Other Supreme Court Precedents, Prohibits Viewpoint-Based Speech Restrictions............................................................................................2

    II.  The Quest Program Cannot Be Made Reasonably Available to Inmates by Alternative Means..............................................................................................6

    III. Accommodation of the Quest Program Will Not Have Adverse "Ripple Effects" ...............................................................................................................7

    IV. No Valid Penological Interest Supports Restriction of the Quest Program.....8

Conclusion .........................................................................................................9

Table of Authorities

Cases

*Bell* v. *Wolfish,* 441 U.S. 520 (1979)..................................................................3

*Block* v. *Rutherford,* 468 U.S. 576 (1984) ...................................................... 2, 8-9

*Jones* v. *N.C. Prisoners' Union,* 433 U.S. 119 (1977) ............................................6, 7

*Matal v. Tam*, 582 U.S. 218 (2017) ...........................................................................8

*Pell* v. *Procunier,* 417 U.S. 817 (1974)..................................................................3, 6

*Reed v. Town of Gilbert*, 576 U.S. 155 (2015) .........................................................2

*Rosenberger v. Rectors and Visitors of the Univ. of Va.*,
   515 U.S. 819 (1995) ............................................................................................4

*Students for Fair Admissions, Inc. v. President and Fellows of Harvard Coll.*,
   600 U.S. 181 (2023) ............................................................................................5

*Thornburgh v. Abbott*, 490 U.S. 401 (1989) .........................................................3, 5

*Turner v. Safley*, 482 U.S. 78 (1987)................................................................1-2, 4-9

Statutes

Minn. Stat. § 244.03, subd. 1 ....................................................................................1

## Statement of Interest[1]

The **National Legal Foundation** (NLF) is a public interest law firm dedicated to the defense of fundamental parental rights and First Amendment liberties, including the freedoms of speech, assembly, and religion. The NLF and its donors and supporters, in particular those from Minnesota, are vitally concerned with the outcome of this case because of its effect on fundamental, First Amendment rights.

## Summary of the Argument

Appellants correctly argue that *Turner v. Safley*, 482 U.S. 78 (1987), does not apply in this case. But even if it does, *Amicus* demonstrates here that the district court misapplied it. *Turner* does not justify, but, rather, invalidates, a viewpoint-based restriction on free speech such as the restriction the prison enforced here. Moreover, the prison's restriction does not satisfy the other prongs of the *Turner* guidelines.

## Argument

Pursuant to state law, the prison has established a limited public forum for "spiritual and faith-based programming." Minn. Stat. § 244.03, subd. 1. The Quest ministry involved in this case is one of approximately 45 outside ministries

---

[1] No counsel for any party authored this brief in whole or in part. No person or entity other than *Amicus* and its counsel made a monetary contribution intended to fund the preparation or submission of this brief. All parties have consented to the filing of this brief.

sponsored by the prison chaplaincy that have spoken in this forum, with attendance of inmates strictly voluntary. J.App. Vol.1 9, 11; R.Doc 1; Compl. ¶¶ 43, 52.

This case is easy to resolve. Quest was prevented from continuing to use the forum because the prison officials didn't like some of the viewpoints of the Quest presentations. Viewpoint-based restrictions are "presumptively unconstitutional." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015). *Turner* did not ignore that presumption, but was built upon it. The district court erred as a matter of law in holding otherwise.

I. *Turner*, Like Other Supreme Court Precedents, Prohibits Viewpoint-Based Speech Restrictions

The Supreme Court in *Turner* stated a rule for considering prison regulations addressed to inmates as follows: "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." 482 U.S. at 89. Building on prior decisions, the Court then set out four factors that lower courts could consider when adjudicating particular cases. The first is this:

> First, there must be a "valid, rational connection" between the prison regulation and the legitimate governmental interest put forward to justify it. *Block* v. *Rutherford, supra,* [468 U.S. 576] at 586 [(1984)]. Thus, a regulation cannot be sustained where the logical connection between the regulation and the asserted goal is so remote as to render the policy arbitrary or irrational. Moreover, the governmental objective must be a legitimate and neutral one. We have found it important to inquire whether prison regulations restricting inmates' First Amendment rights operated in a neutral fashion, without regard

>to the content of the expression. See *Pell* v. *Procunier,* 417 U.S. [817], at 828 [(1974)]; *Bell* v. *Wolfish,* 441 U.S. [520], at 551 [(1979)].

*Id.* at 89-90. This "important" factor is violated here. The prison openly based its refusal to allow the Quest course to continue on the viewpoints expressed in the course. Thus, this situation is unlike that in *Bell*, in which a regulation against receipt of hardcover books was allowed in part because the prison did not distinguish based on the content of the books, 441 U.S. at 551, and also unlike that in *Pell*, in which the Court upheld a prohibition on face-to-face interviews between media and inmates in part because the "restriction operate[d] in a neutral fashion, without regard to the content of the expression." 417 U.S. at 551.

What allows a constriction of constitutional rights in prisons that are not permissible outside of prisons are countervailing *penological* interests. *See Thornburgh v. Abbott*, 490 U.S. 401, 415-16 (1989). But the prison officials here are not truly pursuing penological interests. Instead, they are taking sides in a debate roiling this country and that involves theological, metaphysical, and social considerations. The Quest series has been presented in the prison for years. The prison authorities did not attempt to justify their suspension of it by proof that those who voluntarily attended were acting out violently or otherwise compromising the safety of those who live and work in the institution. Of course, the evidence demonstrates the opposite—the course has had very positive, civilizing effects among those who attend through graduation. J.App. Vol.1 75-76,

80; R.Doc. 16; Schmitt Decl. ¶¶ 24-26, 29-31, 48.  In such circumstances, the objectives the prison authorities seek to advance here are not "legitimate," as *Turner* requires.  482 U.S. at 89-90.

The prison authorities here fail both the neutrality and the legitimacy prongs of the first test set out by the Supreme Court in *Turner*.  This, alone, renders their action unconstitutional and indefensible.  The action must be struck down for the same reason that the Supreme Court in *Rosenberger v. Rectors and Visitors of the University of Virginia*, 515 U.S. 819 (1995), struck down the university's refusal to subsidize a student periodical when it subsidized many others in the limited public forum it created—"it is axiomatic that the government may not regulate speech based on its substantive content or the message it conveys," *id.* at 828, and such discrimination is not excused by an illogical or illegitimate interest advanced by the government.  *Id.* at 839 ("More than once have we rejected the position that the Establishment Clause even justifies, much less requires, a refusal to extend free speech rights to religious speakers who participate in broad-reaching government programs neutral in design.").  "The government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *Id.* at 829.  This is as true of prison officials as it is of any other government officials.

The District Court is simply illogical in holding that eliminating the Quest program due to its viewpoints on gender is "neutral," in the *Turner* sense or any other. J.App. Vol.2 265; R.Doc 38; Mem. Op & Order. *Turner* does not craft a new type of "neutrality" totally divorced from the Supreme Court's free speech case law. The prison officials here are decidedly not "neutral"—they acted based on their disagreement with the teaching on gender roles as presented in the Quest program, not on valid penological interests. It does not carry the day to dress up their decision as a concern about "rehabilitation," using that word as a shibboleth. Such sophistry is elastic enough to cover practically any subject, and, in this instance, the positive effects on graduates of the Quest program graduates disprove, rather than support, any such suggestion. J.App. Vol.1 1-2,10-13; R.Doc. 1; Compl. ¶¶ 2, 4, 46-58; 63; J.App. Vol.1 75-76, 80; R.Doc. 16; Scmitt Decl. ¶¶ 24-25, 28-31, 48. The *Turner* standard "is not toothless." *Thornburgh*, 490 U.S. at 414. Indeed, in *Turner* the Supreme Court rejected just this sort of amorphous resort to "security" and "rehabilitation" interests when unsupported by the record and common sense. 482 U.S. at 97-99 (striking down marriage restriction); *see also Students for Fair Admissions, Inc. v. President and Fellows of Harvard Coll.*, 600 U.S. 181, 214-15 (2023) (rejecting overly broad statements of governmental interests).

II. The Quest Program Cannot Be Made
Reasonably Available to Inmates by Alternative Means

The second factor the *Turner* Court identified to be considered in appropriate cases is this:

> A second factor relevant in determining the reasonableness of a prison restriction, as *Pell* shows, is whether there are alternative means of exercising the right that remain open to prison inmates. Where "other avenues" remain available for the exercise of the asserted right, see *Jones* v. *North Carolina Prisoners' Union, supra,* [433 U.S. 119] at 131 [(1977)], courts should be particularly conscious of the "measure of judicial deference owed to corrections officials . . . in gauging the validity of the regulation." *Pell* v. *Procunier, supra,* at 827.

482 U.S. at 90. This factor, too, plays out in Schmitt's favor. While there are other religious programs made available to inmates, none are the equivalent of the Quest program. It is not like a situation in which a book is available both in hard and soft cover.

The District Court suggests that Schmitt has the alternative of presenting the course, but with all the parts with which the prison officials disagree left out. J.App. Vol.2 266; R.Doc 38; Mem. Op & Order. This, of course, is not an alternative, but a capitulation that would allow prison officials to dictate viewpoint to their hearts' content. Nor are the District Court's suggested alternatives of teaching the full curriculum one inmate at a time during visits or by correspondence suitable substitutes in this situation. J.App. Vol.2 266; R.Doc 38; Mem. Op & Order. What these suggested alternatives of the prison officials

posited by the District Court actually do is show that there is no valid penological purpose in restricting the Quest subject matter. If it okay for one inmate, it is okay for all.

   III.   Accommodation of the Quest Program Will Not Have Adverse "Ripple Effects"

The third factor identified by the *Turner* Court is as follows:

> A third consideration is the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally. In the necessarily closed environment of the correctional institution, few changes will have no ramifications on the liberty of others or on the use of the prison's limited resources for preserving institutional order. When accommodation of an asserted right will have a significant "ripple effect" on fellow inmates or on prison staff, courts should be particularly deferential to the informed discretion of corrections officials. Cf. *Jones* v. *North Carolina Prisoners' Union, supra,* at 132-133.

482 U.S. at 90. Once again, this factor favors Schmitt. This case is one of those instances in which continuing the Quest program "will have no ramifications on the liberty of others or on the use of the prison's limited resources . . . ." *Id.* The prison officials did not shut down the program because it was impinging on the liberty of others; in fact, by withdrawing this program that had proved very popular with the inmates, the only limitation imposed is on those inmates who wish to take the course. Moreover, the prison officials did not rely on any alleged concern about limited resources; that the program had been accommodated for years puts any such suggestion to bed, in any event.

7

The District Court simply invents a potential harm and finds it adequate: "Schmitt's teachings may harm those inmates who committed or were victims of acts of gender-based violence." J.App. Vol.2 267; R.Doc 38; Mem. Op & Order. Absolutely no evidence supports this invention, and what is this supposed harm, in any event? The district court didn't say. That certainly is not a legitimate reason to restrict speech, as disagreement with the ideas expressed by others provides no warrant to stifle their speech. *See Matal v. Tam*, 582 U.S. 218, 244 (2017) (Alito, J., plurality op.) (collecting cases). And all an inmate has to do to avoid whatever the harm may be is to absent himself from the sessions. Again, the prison officials are pushing their own view of gender reality, one that is hotly contested in our society at large, without any real link to penological interests.

IV. No Valid Penological Interest Supports Restriction of the Quest Program

As a final factor for consideration in appropriate circumstances, the *Turner* Court stated as follows:

> Finally, the absence of ready alternatives is evidence of the reasonableness of a prison regulation. See *Block v. Rutherford*, 468 U. S., at 587. By the same token, the existence of obvious, easy alternatives may be evidence that the regulation is not reasonable, but is an "exaggerated response" to prison concerns. This is not a "least restrictive alternative" test: prison officials do not have to set up and then shoot down every conceivable alternative method of accommodating the claimant's constitutional complaint. See *ibid*. But if an inmate claimant can point to an alternative that fully accommodates the prisoner's rights at de minimis cost to valid penological interest, a court may consider that as evidence that the regulation does not satisfy the reasonable relationship standard.

8

*Id.* at 90-91. The context of these remarks in *Turner* is that, if there is no other alternative way to accomplish a legitimate penological purpose of the prison than the one adopted, then it weighs in favor of its reasonableness; if there are other ways that do not similarly infringe on the inmates' constitutional rights, it weighs against the prison's action. But, once again, the reasonableness of the restriction hinges on it actually furthering a "valid penological interest." *Id.* at 91. In *Block*, the penological interests were obvious, as the challenged action was conducting body cavity searches for hidden contraband and weapons. But the prison's suspension of the Quest program fails out of the box, because it does not further a valid penological interest. Thus, there is no legitimate reason to restrict the constitutional rights of the inmates to attend the Quest program.

## Conclusion

Even assuming that the *Turner* factors apply, the District Court misapplied them. The first *Turner* factor requires neutrality when free speech is involved, and it, by itself, invalidates the prison officials' viewpoint restriction of the Quest program. The other factors favor Schmitt as well. The District Court erred as a matter of law and should be reversed.

Respectfully submitted,
this 28th day of October, 2024

<u>/s/ Steven W. Fitschen</u>
Steven W. Fitschen
    *Counsel of Record*
National Legal Foundation
524 Johnstown Road
Chesapeake, Va. 23322
(757) 650-9210
sfitschen@nationallegalfoundation.org

# CERTIFICATE OF COMPLIANCE AND VIRUS SCANNING

I certify that this brief complies with the type-volume limitations of F.R.A.P. 32(a)7(B)(i) and F.R.A.P. 29(a)(5). Exclusive of the exempted portions, this brief contains 2,263 words, including footnotes, in 14-point Times New Roman font. This total was calculated with the Word Count function of Microsoft Office Word 365.

The electronic version of the brief has been scanned for viruses and is virus-free.

s/ Steven W. Fitschen
Steven W. Fitschen
    Counsel of Record for *Amicus Curiae*
The National Legal Foundation
524 Johnstown Road
Chesapeake, Va. 23322
(757) 650-9210
sfitschen@nationallegalfoundation.org

Dated: October 28, 2024

# CERTIFICATE OF SERVICE

I hereby certify that on October 28, 2024, I served the foregoing Brief *Amicus Curiae* of The National Legal Foundation, on all parties through the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service on those participants will be accomplished by the CM/ECF system.

s/ Steven W. Fitschen

Steven W. Fitschen
    Counsel of Record for *Amicus Curiae*
The National Legal Foundation
524 Johnstown Road
Chesapeake, Va. 23322
(757) 650-9210
sfitschen@nationallegalfoundation.org