No. 24-2707

---

IN THE
UNITED STATES COURT OF APPEALS
FOR THE EIGHTH CIRCUIT

_____

Anthony Schmitt,

Plaintiff-Appellant,

vs.

Jolene Rebertus, in her official capacity as Assistant Commissioner
of the Minnesota Department of Corrections; Paul Schnell, in his official
capacity as Commissioner of the Minnesota Department of Corrections,

Defendants-Appellees.

_____

**ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA**

_____

**BRIEF OF APPELLEES JOLENE REBERTUS
AND PAUL SCHNELL**

_____

KEITH ELLISON
State of Minnesota
Attorney General

CORINNE WRIGHT
Assistant Attorney General
Atty. Reg. No. 0390353
445 Minnesota Street, Suite 1400
St. Paul, Minnesota 55101-2131
(651) 757-1198 (Voice)
(651) 297-4139 (Fax)
corinne.wright@ag.state.mn.us

*Counsel continued on next page*

BRADLEY D. SIMON
Assistant Attorney General
Atty. Reg. No. 0390363
445 Minnesota Street, Suite 1400
St. Paul, Minnesota 55101-2131
(651) 757-1354 (Voice)
(651) 297-4139 (Fax)
bradley.simon@ag.state.mn.us

ATTORNEYS FOR APPELLEES

## SUMMARY OF CASE AND REQUEST FOR ORAL ARGUMENT

Appellant Anthony Schmitt volunteered at the Minnesota Correctional Facility-St. Cloud (MCF-SCL) by teaching a DVD course called The Quest for Authentic Manhood (Quest). In 2023, the Minnesota Department of Corrections (DOC) decided it no longer wanted to offer Quest to its incarcerated population because Quest's content did not align with evidence-based correctional practices and conflicted with the DOC's mission and values. Schmitt brought a Section 1983 action against the appellees, DOC officials Commissioner Paul Schnell and Assistant Commissioner Jolene Rebertus, alleging the DOC's decision to stop offering Quest at MCF-SCL violated his First Amendment rights. To force the DOC to reinstate Quest, Schmitt moved for a preliminary injunction.

The district court denied injunctive relief. Schmitt appealed. The DOC officials join Schmitt's request for oral argument, and request 15 minutes.

i

# TABLE OF CONTENTS

**Page**

SUMMARY OF CASE AND REQUEST FOR ORAL ARGUMENT ....................i

TABLE OF AUTHORITIES ...................................................................iv

STATEMENT OF ISSUES ...................................................................1

STATEMENT OF THE CASE................................................................3

I.    DOC FACILITY PROGRAMMING AND SPIRITUAL CARE ...................4

II.   COMMUNITY AND VOLUNTEER-LED PROGRAMMING........................5

III.  THE DOC'S DECISION TO DISCONTINUE THE QUEST PROGRAM .....6

SUMMARY OF ARGUMENT ...............................................................11

ARGUMENT ...................................................................................12

I.    SCHMITT DOES NOT HAVE A CONSTITUTIONAL RIGHT TO TEACH THE
      QUEST PROGRAM IN DOC PRISONS. ...........................................13

      A.   The First Amendment Does Not Apply to the DOC's Own
           Speech................................................................................13

           1.   The DOC's rehabilitative programming has a long
                history..........................................................................14

           2.   The public is likely to perceive programs offered in DOC
                prisons as DOC speech. ...............................................15

           3.   The DOC controls the rehabilitative programming offered
                in its prisons. ...............................................................16

      B.   DOC Prisons Are Nonpublic Fora for Purposes of the First
           Amendment. .......................................................................18

II.   IF SCHMITT HAS A CONSTITUTIONAL RIGHT TO DICTATE THE CONTENT
      OF DOC PRISON PROGRAMMING, THE CORRECT LEVEL OF JUDICIAL
      SCRUTINY IS THE DEFERENTIAL TEST UNDER *TURNER V. SAFLEY*....19

ii

III.   THE DISTRICT COURT PROPERLY APPLIED THE DATAPHASE FACTORS...........22

    A.   Schmitt is Not Likely to Succeed on the Merits of His First Amendment Claims............................................................................23

        1.   There is a rational connection between the DOC's decision to discontinue Quest and its legitimate interest in rehabilitation and reducing recidivism. ...................................24

        2.   Schmitt has alternative means to communicate with incarcerated persons.....................................................25

        3.   Accommodating Schmitt would have a negative impact on DOC facilities. ........................................................26

        4.   There is no de minimis-cost alternative for keeping the Quest program active in DOC facilities...................................27

    B.   Schmitt Did Not Establish He Would Suffer Irreparable Harm Without a Preliminary Injunction........................................................28

    C.   The Balance of Harms and the Public Interest Favored Denying Schmitt's Motion........................................................................28

CONCLUSION ...........................................................................30

Appellate Case: 24-2707    Page: 5    Date Filed: 11/20/2024 Entry ID: 5458792

# TABLE OF AUTHORITIES

**Page**

**Federal Cases**

*Adderley v. Florida*,
  385 U.S. 39 (1966) ............................................................................... 19

*Barrett v. Claycomb*,
  705 F.3d 315 (8th Cir. 2013) ............................................................... 12

*Bd. of Regents of Univ. of Wis. Sys. v. Southworth*,
  529 U.S. 217 (2000) ............................................................................. 18

*Cal. First Amend. Coal. v. Woodford*,
  299 F.3d 868 (9th Cir. 2002) ........................................................... 1, 21

*Cornelius v. NAACP Legal Defense and Educ. Fund, Inc.*,
  473 U.S. 788 (1985) ............................................................................. 18

*Dataphase Sys., Inc. v. C L Systems, Inc.*,
  640 F.2d 109 (8th Cir. 1981) ....................................................... passim

*Douglas v. Sigler*,
  386 F.2d 684 (8th Cir. 1967) ............................................................... 29

*Finney v. Ark. Bd. of Corr.*,
  505 F.2d 194 (1974) ............................................................................. 15

*Fulton v. City of Phila.*,
  593 U.S. 522 (2021) ............................................................................. 20

*Gen. Motors Corp. v. Harry Brown's, LLC*,
  563 F.3d 312 (8th Cir. 2009) ............................................................... 28

*Goff v. Harper*,
  60 F.3d 518 (8th Cir. 1995) ............................................................ 2, 22

iv

*Jarrard v. Sheriff of Polk Cnty.*,
  115 F.4th 1306 (11th Cir. 2024) ........................................................ 21

*Jones v. N.C. Prisoners' Lab. Union, Inc.*,
  433 U.S. 119 (1977) ......................................................................... 19

*Lewis v. Casey*,
  518 U.S. 343 (1996) ............................................................... 20, 29, 30

*Masterpiece Cakeshop v. Colo. Civ. Rts. Comm'n*,
  584 U.S. 617 (2018) ......................................................................... 20

*Murchison v. Rogers*,
  779 F.3d 882 (8th Cir. 2015) ....................................................... 26, 27

*Nken v. Holder*,
  556 U.S. 418 (2009) ......................................................................... 28

*O'Lone v. Estate of Shabazz*,
  482 U.S. 342 (1987) ......................................................................... 20

*Overton v. Bazzetta*,
  539 U.S. 126 (2003) ......................................................................... 20

*Pell v. Procunier*,
  417 U.S. 817 (1974) ......................................................................... 15

*Perry Educ. Ass'n v. Perry Local Educators' Ass'n*,
  460 U.S. 37 (1983) ........................................................................ 1, 19

*Pleasant Grove City v. Summum*,
  555 U.S. 460 (2009) .................................................................. passim

*Procunier v. Martinez*,
  416 U.S. 396 (1974) .................................................................. 14, 15

*Richmond Newspapers v. Virginia*,
  448 U.S. 555 (1980) ......................................................................... 19

v

*Rogers v. Scurr,*
   676 F.2d 1211 (8th Cir. 1982) ................................................... 2, 28, 29

*Rosenberger v. Rector and Visitors of Univ. of Va.,*
   515 U.S. 819 (1995) .................................................................... 18

*Saxbe v. Wash. Post Co.,*
   417 U.S. 843 (1974) .................................................................... 19

*Shaw v. Murphy,*
   532 U.S. 223 (2001) .................................................................... 20

*Shurtleff v. City of Boston,*
   596 U.S. 243 (2022) .................................................................... 14

*Square Rev. & Advisory Bd. v. Pinette,*
   515 US 753 (1995) ...................................................................... 18

*Thornburgh v. Abbott,*
   490 U.S. 401 (1989) ............................................................... passim

*Trinity Lutheran Church of Columbia v. Comer,*
   582 U.S. 449 (2012) .................................................................... 20

*Turner v. Safely,*
   482 U.S. 78 (1987) ................................................................. passim

*Turtle Island Foods, SPC v. Thompson,*
   992 F.3d 694 (8th Cir. 2021) ...................................................... 22

*Walker v. Tex. Div., Sons of Confederate Verterans, Inc.,*
   576 U.S. 200 (2015) ............................................................... passim

*Washington v. Harper,*
   494 U.S. 210 (1990) .................................................................... 20

Appellate Case: 24-2707     Page: 8     Date Filed: 11/20/2024 Entry ID: 5458792

**State Statutes**

Minn. Stat. § 241.01 (2024) ................................................................... 3, 15

Minn. Stat. § 244.03 (2024) ............................................................. 3, 15, 16

**Other Authorities**

1959 Minn. Laws 353 ......................................................................... 3, 15

Appellate Case: 24-2707    Page: 9    Date Filed: 11/20/2024 Entry ID: 5458792

# STATEMENT OF ISSUES

I.  Does Schmitt, a community member, have a constitutional right to compel the Minnesota Department of Corrections (DOC) to use the DVD course The Quest for Authentic Manhood as part of its rehabilitative prison programming?

*The district court did not directly address whether Schmitt has a constitutional right as a community member to dictate prison programming, but it did express skepticism that such a right exists.*

Most Apposite Authorities:

*Walker v. Tex. Div., Sons of Confederate Verterans, Inc.*, 576 U.S. 200 (2015)
*Pleasant Grove City v. Summum*, 555 U.S. 460 (2009)
*Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37 (1983)

II.  If Schmitt does have a constitutional right to teach The Quest for Authentic Manhood in DOC prisons, what is the proper level of judicial scrutiny?

*The district court determined that if Schmitt has a constitutional right to continue teaching The Quest for Authentic Manhood program in DOC prisons, then the proper level of judicial scrutiny is whether the DOC's cancellation of the program was reasonably related to legitimate penological interests.*

Most Apposite Authorities:

*Thornburgh v. Abbott*, 490 U.S. 401 (1989)
*Turner v. Safely*, 482 U.S. 78 (1987)
*Cal. First Amend. Coal. v. Woodford*, 299 F.3d 868 (9th Cir. 2002)

III.  Did the district court properly apply the *Dataphase* factors when it denied Schmitt's motion for preliminary injunction?

*The district court denied Schmitt's motion for preliminary injunction after finding each Dataphase factor favored the DOC.*

1

Most Apposite Authorities:

*Turner v. Safely*, 482 U.S. 78 (1987)
*Goff v. Harper*, 60 F.3d 518 (8th Cir. 1995)
*Rogers v. Scurr*, 676 F.2d 1211 (8th Cir. 1982)
*Dataphase Sys., Inc. v. C L Systems, Inc.*, 640 F.2d 109 (8th Cir. 1981)

2

## STATEMENT OF THE CASE

The Minnesota Legislature granted certain powers and duties to the DOC Commissioner, including the rehabilitation of persons committed to his custody. Minn. Stat. § 241.01, subd. 3a (2024). The Commissioner is responsible for developing, implementing, and providing rehabilitative programs at all DOC facilities, including substance use disorder treatment, domestic abuse programming, spiritual and faith-based programming, culturally responsive programming, and other rehabilitative programs. Minn. Stat. § 244.03, subd. 1 (2024).

The agency's rehabilitative responsibilities are longstanding, going back to the 1959 creation of the DOC. *See* 1959 Minn. Laws 353. When the DOC was established, the Minnesota Legislature required that the DOC Commissioner "have wide and successful administrative experience in correctional programs embodying rehabilitative concepts." *Id.* Today the DOC has the same general rehabilitative mission to reduce rates of recidivism, which it accomplishes through programs and interventions based on evidence-based principles. (J. App. Vol. 1 at 129; R. Doc. 22, at 2.)

3

## I.    DOC FACILITY PROGRAMMING AND SPIRITUAL CARE

One important way the DOC fulfills its rehabilitative mission, values, and goals is through its facility programming.  (J. App. Vol. 1 at 130; R. Doc. 22, at 3.) A DOC program is "a plan of things done in order to achieve a specific result; a facilitated curriculum that is consistently delivered on a regular basis, has a targeted population, addresses a risk and a need, has measured outcomes, has specific admission and discharge criteria, and is evidence based." (*Id.*)  Evidence-based programs are "programs that have been researched and are proven to be effective at reducing recidivism." (*Id.*)  All facility programs are reviewed by the DOC's effective interventions committee and approved or denied by the facility's warden or designee. (*Id.*)

Additionally, the DOC provides spiritual care throughout its facilities to accommodate the various spiritual and religious affiliations of its incarcerated population.  (J. App. Vol. 1 at 136; R. Doc. 22, at 9; J. App. Vol. 1 at 186-95; R. Doc. 22-1, at 49-58.)  Under the DOC's Spiritual Care Policy, there are also opportunities for properly screened and trained volunteers, under the supervision and direction of the facility chaplain, to provide spiritual services to incarcerated individuals.  (J. App. Vol. 1 at 190; R. Doc. 22-1, at 53.)

4

## II. COMMUNITY AND VOLUNTEER-LED PROGRAMMING

The DOC allows volunteers to enter DOC facilities and lead programs when those programs enhance and expand already existing services and programs. (*Id.*) Prospective volunteers must apply and be approved by the DOC before they are permitted to lead a program in DOC facilities. (*Id.*) The DOC decides whether to approve or deny an applicant based on a number of considerations, including whether the volunteer applicant meets all required qualifications and passes all required background checks, whether the proposed program is consistent with the DOC's overall goals and policies, and whether the proposed program raises any safety or security concerns for the prison, the incarcerated population, or staff. (*Id.*) Once an applicant is approved to lead a program, the DOC retains discretion to periodically review the program. (*Id.*) If the DOC determines that a program is inconsistent with its policies and goals, or if it presents a risk to the safety and security of the prison, the DOC can discontinue the program. (J. App. Vol. 1 at 129-130; R. Doc. 22, at 3-4.) Approved volunteers are recertified annually. (J. App. Vol. 1 at 131; R. Doc. 22, at 4.) The recertification procedure is the same as the original application process, including review of all relevant DOC policies and procedures. (*Id.*) Additionally, DOC facilities may suspend or terminate a volunteer for violating DOC policies. (*Id.*)

Appellate Case: 24-2707    Page: 14    Date Filed: 11/20/2024 Entry ID: 5458792

When a community member or organization wants to propose programming, they complete an online DOC program proposal application, available on the DOC's website. (J. App. Vol. 1 at 131; R. Doc. 22, at 4; J. App. Vol. 1 at 149-152; R. Doc. 22-1, at 12-15.) The current application notifies applicants that the DOC reviews program proposals for alignment with evidence-based correctional practices. The DOC also informs applicants that it prioritizes proposals that are evidence-based and fill gaps in current programming. (*Id.*) Because the DOC receives more program proposals than it can accommodate, it focuses on programs that support its mission to reduce recidivism and that promote its values of supporting a safety-conscious environment while providing evidence-based interventions. (*Id.*)

## III. THE DOC'S DECISION TO DISCONTINUE THE QUEST PROGRAM

Schmitt began facilitating the Quest program at MCF-SCL in 2012, before the DOC implemented its current process for reviewing community program proposals. (J. App. Vol. 1 at 131-32; R. Doc. 22, at 4-5.) In 2023, Schmitt inquired about expanding Quest to other DOC facilities, which prompted the DOC's Associate Director of Case Management and Programming, Bridget Letnes, to review the Quest program materials, including the program's workbook, using the DOC's current programming standards. (J. App. Vol. 1 at 132; R. Doc. 22, at 5.) Schmitt also allowed Letnes to borrow his copy of the Quest DVD library, which

6

incarcerated individuals viewed as part of the Quest curriculum. (*Id.*) After reviewing the Quest workbook and watching the DVD course, Letnes reported to the DOC's Assistant Commissioner for Health, Recovery, and Programming, Jolene Rebertus, that Quest did not align with evidence-based correctional practices and conflicted with the DOC's mission and values. (*Id.*) Rebertus reviewed the information reported by Letnes and agreed with her concerns about the program. (*Id.*) In July 2023, Rebertus informed Schmitt that the DOC would no longer offer Quest as a program for its incarcerated population. (*Id.*)

The DOC's concerns with Quest fell into two broad categories. (*Id.*) The first is how the program content interacts with the DOC's sex offense and domestic violence programming. (*Id.*) The second is how the program content implicates the DOC's prohibition on harassment and discrimination in its facilities and the potential impact on security and safety. (*Id.*) The Quest program teaches that a "real" man is not weak, feminine, or passive, and that homosexuality and "the feminized man" are the result of an absent father in the home. (*Id.*) It proposes that there is no credible evidence that homosexuality is biological, that there is a radical gay agenda, and that it is a myth that homosexuals cannot "change." (*Id.*) The program also teaches that manhood can only be achieved through heterosexual relationships. (J. App. Vol. 1 at 132-33; R. Doc. 22, at 5-6.) Quest also claims that an "ignorant" or "needy" mother may cause a man to engage with pornography or turn to violence, crime,

alcoholism, abuse, and rape. (J. App. Vol. 1 at 133; R. Doc. 22, at 6.) Additionally, the program depicts women as fragile and subservient to men. (*Id.*)

Teaching these stereotypes in a correctional setting are problematic for many reasons. (*Id.*) First, Quest's depictions of women—particularly mothers—as the *reason* men commit crimes is not useful or valuable for incarcerated persons who are expected to enroll in DOC's sex offense or domestic violence programming. (*Id.*) And as an intake facility, MCF-SCL is the first stop for the majority of adult men sentenced to incarceration in a DOC facility. (*Id.*) Most are transferred to another DOC facility based on a variety of factors including rehabilitative programming needs. (*Id.*)

Next, the DOC has a diverse incarcerated population and workforce that include female and LGBTQ+ persons. (*Id.*) The DOC's policy prohibiting harassment and discrimination states clearly that the DOC "does not tolerate any form of discrimination or harassment based on a protected class in its workplaces and programs." (J. App. Vol. 1 at 133; R. Doc. 22, at 6; J. App. Vol. 1 at 155-57; R. Doc. 22-1, at 17-20.) Included within the definition of protected class are sex, familial status, marital status, sexual orientation, gender identity, and gender expression. (J. App. Vol. 1 at 133; R. Doc. 22, at 6; J. App. Vol. 1 at 158-59; R. Doc. 22-1, at 21-22.) The DOC's harassment and discrimination policy applies "[d]epartment-wide" and covers "all applicants, employees, contractors, student

8

workers, vendors, volunteers, and third parties who have interactions with the [DOC]." (J. App. Vol. 1 at 133; R. Doc. 22, at 6; J. App. Vol. 1 at 154; R. Doc. 22-1, at 17.)

Additionally, the DOC's Offender Discipline Rules prohibit incarcerated persons from abusing or harassing any person in a facility. (J. App. Vol. 1 at 133; R. Doc. 22, at 6; J. App. Vol. 1 at 178; R. Doc. 22-1, at 41.) Examples of abuse or harassment under the discipline rules include "derogatory or profane writing, remarks or gestures; name calling; yelling; and other acts that constitute public expression of disrespect for authority." (J. App. Vol. 1 at 133-34; R. Doc. 22, at 6-7; J. App. Vol. 1 at 178; R. Doc. 22-1, at 41.) Incarcerated persons are also prohibited from engaging in sexual harassment which consists of making "repeated or unwelcome sexual advances; requests for sexual favors; or verbal comments, gestures, or actions of a derogatory or offensive nature to another." (*Id.*)

Quest's content devalues women and LGBTQ+ individuals which is in direct conflict with the DOC's mission, values, and harassment and discrimination polices. (J. App. Vol. 1 at 134; R. Doc. 22, at 7.) These teachings also conflict with the DOC's mission and goals of rehabilitation and reducing recidivism rates among its incarcerated population. (*Id.*) Many incarcerated individuals have been convicted of crimes involving domestic abuse or sexual assault, and many have been victims of those crimes themselves. (*Id.*) Quest's teachings that devalue certain individuals

Appellate Case: 24-2707     Page: 18     Date Filed: 11/20/2024 Entry ID: 5458792

based on gender or sexual orientation are harmful and hinder the rehabilitation process for incarcerated individuals. (*Id.*)

The devaluation of women and LGBTQ+ persons also creates safety and security issues in DOC facilities. (*Id.*) The DOC has many incarcerated persons and staff who do not meet Quest's definition of an "authentic man." (*Id.*) The DOC also has many female staff members, including correctional officers, who interact with incarcerated individuals daily. (*Id.*) Quest's teachings reinforce negative stereotypes about women and LGBTQ+ persons that undermine the authority of women and LGBTQ+ correctional officers. (*Id.*) The safe, secure, and orderly operation of a correctional facility depends on incarcerated persons following facility rules and respecting the authority of facility staff. (*Id.*) Programs like Quest that promote negative beliefs about certain groups of people create more dissidence in the prison, increase confrontations between incarcerated individuals, and increase insubordinate behavior by incarcerated individuals. (J. App. Vol. 1 at 134-35; R. Doc. 22, at 7-8.) These incidents have the potential to turn violent and require interventions by staff, thus presenting a risk to the safety and security of incarcerated individuals and DOC staff alike. (*Id.*)

The DOC discontinued Quest because of its content, not because of Schmitt's religious beliefs. (J. App. Vol. 1 at 135; R. Doc. 22, at 8.) According to the Quest website, the program was founded by a man named Robert Lewis. (*Id.*) It is the

10

content taught in *Lewis's program* that is objectionable.[1]  (*Id.*)  It is not Schmitt's Christian beliefs, but rather the specific teachings included in Quest's program curriculum that prompted the DOC to discontinue offering the program.  (*Id.*)  In fact, MCF-SCL offers other Christian-based programming and opportunities for its incarcerated population.  (*Id.*)

Although the DOC discontinued the Quest program, it did not suspend or terminate Schmitt from volunteering at its prisons.  (J. App. Vol. 1 at 137; R. Doc. 22, at 10.)  Schmitt is free to apply to teach a different program at a DOC prison.  (*Id.*)  He can also correspond with incarcerated individuals by mail, and visit individuals incarcerated at MCF-SCL or any other prison pursuant to the DOC's visiting policy.  (*Id.*)

## SUMMARY OF ARGUMENT

Schmitt, a community member, sought a preliminary injunction that would force the DOC to reestablish Quest in MCF-SCL.  The district court did not abuse its discretion when it denied injunctive relief.  The DOC does not want to provide this particular program to its incarcerated population because the program fails to align with evidence-based correctional practices and conflicts with the DOC's

---

[1] The Authentic Manhood website includes two programs, the "Men's Fraternity" curriculum and another program, "33 The Series."  The DOC's understanding is that the "Quest for Authentic Manhood" program is the same as the "Men's Fraternity" program.  The Authentic Manhood website can be found at: *https://www.authenticmanhood.com*.  (last visited on November 20, 2024).

Appellate Case: 24-2707     Page: 20     Date Filed: 11/20/2024 Entry ID: 5458792

mission and values. Under the deferential standard that applies to prison regulations, the DOC's decision to discontinue Quest served legitimate penological interests. This Court should affirm.

## ARGUMENT

Appellate courts review the denial of a preliminary injunction for an abuse of discretion. *Barrett v. Claycomb,* 705 F.3d 315, 320 (8th Cir. 2013). A district court only abuses its discretion if the decision rests on clearly erroneous factual findings or legal conclusions. *Id.* Here, the district court did not abuse its discretion because legally and factually Schmitt is not likely to succeed on the merits of his claims.

First, Schmitt has no constitutional right to dictate the content of the DOC's prison programming. Its programming is government speech for the purposes of the First Amendment; Schmitt has no say in the matter.

But even if Schmitt has a constitutional right to dictate the content of DOC prison programming, the district court correctly examined Schmitt's claims using the deferential test the Supreme Court applied in *Turner v. Safley*, 482 U.S. 78 (1987); prison regulations that burden constitutional rights need only be reasonably related to legitimate penological interests. *Id.* at 89. Using the *Turner* test, the district court correctly applied the *Dataphase* factors and reached the correct conclusion. *See Dataphase Sys., Inc. v. C L Systems, Inc.*, 640 F.2d 109, 114

Appellate Case: 24-2707     Page: 21     Date Filed: 11/20/2024 Entry ID: 5458792

(8th Cir. 1981) (stating factors to consider in determining whether a preliminary injunction should issue). Schmitt has no basis for a preliminary injunction.

## I. SCHMITT DOES NOT HAVE A CONSTITUTIONAL RIGHT TO TEACH THE QUEST PROGRAM IN DOC PRISONS.

Schmit will not succeed on the merits of his claims because he has no constitutional right to dictate the content of the DOC's prison programming.[2] First, the DOC's rehabilitative programming is government speech. In other words, the DOC is not constitutionally compelled to be a conduit through which Schmitt communicates his religious beliefs. And even if DOC programming is not government speech, prisons are nonpublic fora for First Amendment purposes, so the DOC has a right to make subject-matter distinctions among its program offerings and limit access to its prisons.

### A. The First Amendment Does Not Apply to the DOC's Own Speech.

Because the DOC's rehabilitative programming is government speech, "it is entitled to promote a program, espouse a policy, or to take a position" when it

---

[2] Although the preliminary injunction briefing, hearing, and district court's order focused primarily on the appropriate level of judicial scrutiny to apply to Schmitt's claims, the court was rightly skeptical that Schmitt has *any* constitutional interest in facilitating Quest in DOC prisons. (*See* Add. 10; J. App. Vol. 2 at 267; R. Doc. 38, at 10 (stating it "cannot be that prisons are constitutionally obligated to accept all comers who wish to offer religious programming no matter its message")). Likewise, the DOC did not concede such an interest exists. (*See* J. App. Vol. 1 at 116-117; R. Doc. 21, at 10-11 (stating that as "a threshold matter, Schmitt does not cite any case law to support his claim that he has a First Amendment right to enter a DOC prison on a regular basis and teach a course to incarcerated persons")).

decides what programs to offer (or not offer) in its prisons. *Walker v. Tex. Div., Sons of Confederate Verterans, Inc.*, 576 U.S. 200, 208 (2015). The First Amendment protects private parties like Schmitt from government encroachments on their right to speak freely. *Pleasant Grove City v. Summum*, 555 U.S. 460, 467 (2009). What the Free Speech Clause does not do, however, is compel the government to speak *for* Schmitt. *Id.*

Whether certain expression constitutes government speech is a context-driven analysis. *Shurtleff v. City of Boston*, 596 U.S. 243, 252 (2022). Here, the purpose of the inquiry is to ascertain whether the DOC intends to speak for itself with its rehabilitative programs or whether the DOC intends to regulate Schmitt's private expression. *Id.* Courts generally consider three factors: (1) the history of the targeted expression; (2) who the public likely perceives is speaking (the government or a private person); and (3) the extent to which the government shapes or controls the expression. *Id.*; *Walker*, 576 U.S. at 209-210; *Cajune v. Ind. Sch. Dist. 194*, 105 4th 1070, 1079 (8th Cir. 2024). Each factor establishes that the DOC's rehabilitative programs are government speech.

### 1. The DOC's rehabilitative programming has a long history.

Historically, rehabilitation and recidivism reduction have been a primary purpose of incarceration. *See Procunier v. Martinez*, 416 U.S. 396, 412 (1974), *overruled on other grounds by Thornburgh v. Abbott*, 490 U.S. 401, 413-14 (1989)

14

(identifying rehabilitation of prisoners as an important governmental interest"); *Pell v. Procunier*, 417 U.S. 817, 822-23 (1974) (noting that a paramount objective of incarceration is rehabilitation); *Finney v. Ark. Bd. of Corr.*, 505 F.2d 194, 209 (1974) (solidifying the importance of rehabilitative programming, noting that a lack of rehabilitative programs in prison "could, in the face of 'other conditions,' be violative of the Eighth Amendment"). In Minnesota, the DOC is part of that historical tradition. At the DOC's creation in 1959, the Minnesota Legislature required the DOC Commissioner have "experience in correctional programs embodying rehabilitative concepts." 1959 Minn. Laws 353. The DOC has long used prison programming to promote rehabilitation and reduce recidivism. *See Walker*, 576 U.S. at 211-12 (noting Texas historically used license plates to convey speech promoting tourism and local industry).

### 2. The public is likely to perceive programs offered in DOC prisons as DOC speech.

The public, as well as incarcerated persons, are likely to identify rehabilitative programming offered inside DOC prisons with the DOC. The Minnesota Legislature tasked the DOC Commissioner, not private persons like Schmitt, with the responsibility of rehabilitating persons committed to incarceration in DOC custody. Minn. Stat. § 241.01, subd. 3a. That responsibility includes developing, implementing, and providing rehabilitative programs at all DOC facilities. Minn. Stat. § 244.03, subd. 1.

15

Moreover, *where* the speech is taking place—inside a DOC facility—matters. In *Walke*r, the government speech was communicated on government issued license plates. 576 U.S. at 212-13. In *Summum*, the government speech was communicated on permanent monuments displayed in a public park. 555 U.S. at 470; *cf. Cajune*, 105 4th at 1080 (concluding BLM posters were not government speech where teachers may, but were not required to, display them in classrooms). Thus, it is likely the public would identify messages communicated through prison programming offered *inside* DOC facilities with the DOC, not with Schmitt.

### 3. The DOC controls the rehabilitative programming offered in its prisons.

Because developing, implementing, and providing rehabilitative programming is the sole responsibility of the DOC Commissioner, the DOC maintains control over the messages conveyed through its programming. *See* Minn. Stat. § 244.03, subd. 1. For instance, any newly proposed facility programs are reviewed by a DOC committee and approved or denied by the facility's warden or designee. Likewise, any volunteer-led programs require DOC approval. And if the DOC determines that a volunteer-led program is inconsistent with its policies and goals or presents a risk to the safety and security of its prisons, the DOC may discontinue the program.

This approval process, coupled with the Legislature's directive that the DOC Commissioner have sole responsibility over DOC programming, establishes that the

16

DOC maintains direct control over the messages conveyed through its programming. *See Walker*, 576 U.S. at 213 (concluding Texas maintained direct control over the messages on specialty license plates when statute gave the state "sole control" over designs and that motor vehicles board exercised final approval of proposed designs).

Schmitt nonetheless argues that the Quest program is *his* speech. Schmitt is wrong, and the Supreme Court's decision in *Summum* shows why. 555 U.S. at 473-74. In *Summum*, where a donated monument was placed in a city park, the Court reasoned that because the city displayed the monument, it was linked to the city's identity and was thus the city's speech and not the donor's and any "rights previously possessed by the monument's donor [had] been relinquished." *Id.* Similarly, because Schmitt was teaching the Quest program in a DOC prison as part of the DOC's volunteer programming, he too relinquished any constitutional right of expression.

In sum, the DOC has a long history of providing rehabilitative programming in its prisons; the public would likely identify prison programming with the DOC and not Schmitt; and the DOC maintains control over its programming. The DOC's rehabilitative programming is thus government speech. Accordingly, the DOC was not constrained by the First Amendment when it discontinued offering the Quest program. Indeed, when it comes to its prison programming, the DOC has a right to "speak for itself," and thus "is entitled to say what it wishes" or in this case, what it

17

does not wish to say.[3]  *Summum* at 467-68 (quoting *Bd. of Regents of Univ. of Wis. Sys. v. Southworth*, 529 U.S. 217, 229 (2000); *Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819, 833 (1995)).

### B.    DOC Prisons Are Nonpublic Fora for Purposes of the First Amendment.

Even if DOC rehabilitative programs are not government speech, Schmitt has yet another hurdle to clear:  DOC prisons are nonpublic fora under a traditional First Amendment forum analysis.  *See Walker*, 576 U.S. at 215 (explaining that a traditional forum analysis is only necessary when the speech at issue is *not* government speech).  After all, even protected speech is not permissible in every place and at any time.  *Cornelius v. NAACP Legal Defense and Educ. Fund, Inc.*, 473 U.S. 788, 800 (1985).  The extent to which the government can restrict speech depends on the nature of the forum.  *Id.*  And the level of judicial scrutiny is directly related to the type of fora.  For instance, in traditional public and designated public fora, speakers can only be excluded if the exclusion serves a compelling state interest and is narrowly drawn.  *Id.*  Speakers may be excluded from a nonpublic forum, however, if the exclusion is reasonable and not an effort to suppress expression based on the speaker's viewpoint.  *Id.*

---

[3] Similarly, because the DOC is speaking for itself, Schmitt does not have a free exercise right to teach Quest in DOC prisons.  *See Cap. Square Rev. & Advisory Bd. v. Pinette,* 515 US 753, 768 (1995) (stating the government does not run the risk of suppressing free exercise when it restrains only its own expression).

Appellate Case: 24-2707     Page: 27     Date Filed: 11/20/2024 Entry ID: 5458792

Prisons are "most emphatically" nonpublic fora. *Jones v. N.C. Prisoners'*
*Lab. Union, Inc.*, 433 U.S. 119, 135 (1977); *see also Richmond Newspapers v.*
*Virginia*, 448 U.S. 555, n.11 (1980) (stating by definition prisons are not "'open' or
public places"); *Saxbe v. Wash. Post Co.*, 417 U.S. 843, 849 (1974) (acknowledging
same); *Adderley v. Florida*, 385 U.S. 39, 47-48 (1966) (concluding jailhouse
curtilage was a nonpublic forum). And "implicit in the concept of the nonpublic
forum is the right to make distinctions in access on the basis of subject matter and
speaker identity" and to limit access based on the "intended purpose of the property."
*Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 49 (1983). Thus,
the DOC has a right to make subject-matter distinctions among its program offerings
and to limit activities to those that are "compatible with the intended purpose" of its
prisons. *Id.*

## II. IF SCHMITT HAS A CONSTITUTIONAL RIGHT TO DICTATE THE CONTENT OF DOC PRISON PROGRAMMING, THE CORRECT LEVEL OF JUDICIAL SCRUTINY IS THE DEFERENTIAL TEST UNDER *TURNER V. SAFLEY*.

The district court correctly concluded that *if* Schmitt has a First Amendment
right to teach Quest in DOC prisons, then the appropriate level of judicial scrutiny
is from *Turner v. Safley*: prison regulations that burden constitutional rights need
only be reasonably related to legitimate penological interests. 482 U.S. at 89.
Schmitt argues, relying on inapposite caselaw, that strict scrutiny is appropriate. But
Schmitt ignores the most important fact in this case; the DOC is in the business of

running prisons. It is not contracting with foster care agencies. *Cf. Fulton v. City of Phila.*, 593 U.S. 522 (2021). It is not dictating expression through cake decoration. *Cf. Masterpiece Cakeshop v. Colo. Civ. Rts. Comm'n*, 584 U.S. 617 (2018). It is not denying churches rubber playground surfaces. *Cf. Trinity Lutheran Church of Columbia v. Comer*, 582 U.S. 449 (2012). These distinctions may be obvious, but they matter, because this case is about prison administration.

The Supreme Court's prison-administration jurisprudence is well established and unambiguously applies *Turner*'s level of scrutiny to challenges to prison rules, policies, and decisions affecting prison administration. *See, e.g., Overton v. Bazzetta*, 539 U.S. 126 (2003) (applying *Turner* to visiting restrictions); *Shaw v. Murphy*, 532 U.S. 223 (2001) (applying *Turner* to restrictions on inmate-to-inmate correspondence); *Lewis v. Casey*, 518 U.S. 343 (1996) (applying *Turner* to inmate access-to-courts claims); *O'Lone v. Estate of Shabazz*, 482 U.S. 342 (1987) (applying *Turner* to challenges to prison work rules limiting inmates' ability to attend religious services); *Thornburgh*, 490 U.S. 401 (applying *Turner* to restrictions on incoming publications); *Washington v. Harper*, 494 U.S. 210 (1990) (applying *Turner* to policy allowing treatment of nonconsenting inmates with antipsychotic medication).

Schmitt attempts an end run around *Turner* by claiming its deferential test does not apply to outsiders like him. He relies on a Ninth Circuit case involving a

challenge to a prison regulation barring public viewing of lethal injection procedures.[4] *Cal. First Amend. Coal. v. Woodford*, 299 F.3d 868 (9th Cir. 2002). Schmitt misreads *Woodford*. In *Woodford*, the Ninth Circuit noted that it believed the Supreme Court had not applied *Turner* in a similar case, but then the court did just that, it applied *Turner* to the prison procedure at issue—a procedure regulating only outsiders. 299 F.3d at 879-85.

By claiming *Turner* does not apply to him, Schmitt misses the point. *Turner*'s test cares not about *who* (incarcerated person or outsider) but *what* (prison administration). "Subjecting the day-to-day judgments of prison officials to an inflexible strict scrutiny analysis would seriously hamper their ability to . . . adopt innovative solutions to the intractable problems of prison administration." *Turner* at 89. Indeed, *Thornburgh* extinguished any notion that the focus should be "on the individuals whose rights allegedly have been infringed" and stated that "any attempt

---

[4] Schmitt also cites an Eleventh Circuit case where a volunteer jail chaplain was dismissed from a jail's ministry program for violating a policy prohibiting the performance of baptisms and wedding ceremonies for inmates. *Jarrard v. Sheriff of Polk Cnty.*, 115 F.4th 1306 (11th Cir. 2024). The volunteer chaplain claimed his dismissal was because of his personal viewpoint on baptism. *Id.* at 1313. But the facts in *Jarrard* are easily distinguishable from those here. *Jarrard* was a minister directly providing spiritual care (baptisms and marriages) to inmates. Here, the DOC chose to discontinue a program that was unsuitable as a DOC rehabilitative program, and it did not terminate Schmitt as a volunteer. Additionally, the legal analysis in *Jarrard* primarily focused on whether the volunteer chaplain was a de facto government employee, which is not an issue here. *Id.* at 1314-18.

to forge separate standards for cases implicating the rights of outsiders is out of step." 490 U.S. at 410, n.9.

If Schmitt were challenging different government conduct, then his insistence on a heightened level of judicial scrutiny might hold water. But that is not *this* case. Here Schmitt challenges the DOC's decision to cancel Quest: a decision squarely in the realm of prison administration. As the district court correctly concluded, Schmitt cannot sidestep *Turner*. (Add. 5-6; J. App. Vol. 2 at 262-63; R. Doc. 38, at 5-6.)

## III. THE DISTRICT COURT PROPERLY APPLIED THE DATAPHASE FACTORS.

The district court correctly denied Schmitt's motion for preliminary injunction. Injunctive relief is an extraordinary remedy, and the movant has the burden of demonstrating that he is entitled to an injunction. *Turtle Island Foods, SPC v. Thompson*, 992 F.3d 694, 699 (8th Cir. 2021). And courts are particularly cautious of issuing temporary relief in the correctional context because of the difficulties inherent in prison administration. *Goff v. Harper*, 60 F.3d 518, 520 (8th Cir. 1995). The district court denied Schmitt's motion because he failed to demonstrate: (1) his likelihood of success on the merits of his claims; (2) that he would suffer irreparable harm without the injunction; (3) the balance between his claimed harm and the harm granting the injunction will inflict on the DOC favored him; and (4) the public interest favored granting the injunction. *Dataphase Sys., Inc.*, 640 F.2d at 114.

Appellate Case: 24-2707    Page: 31    Date Filed: 11/20/2024 Entry ID: 5458792

### A. Schmitt is Not Likely to Succeed on the Merits of His First Amendment Claims.

Schmitt is not likely to prevail on the merits of his claims for multiple reasons, primarily because he has no First Amendment right to dictate the content of DOC prison programming. (*See supra* I.A.) But even if he has such a right, prisons are nonpublic fora for First Amendment purposes, so the DOC has its own right to make distinctions about what is communicated in its prisons. (*See supra* I.B.) And if Schmitt could somehow establish that he has a constitutional right at stake in this case, then *Turner*'s standard applies, and the question becomes whether the DOC's decision to cancel Quest reasonably related to a valid penological interest. (*See supra* II.)

The four factors that courts use to assess the reasonableness of a prison restriction are: (1) whether there is a rational connection between the restriction and the legitimate government interest put forward to justify it; (2) whether there are alternative means of exercising the right; (3) the impact an accommodation of the asserted constitutional right will have on prison staff, other incarcerated persons, and prison resources; and (4) whether ready alternatives exist with a de minimis cost. *Turner*, 482 U.S. at 89-90. Applying the facts in the record to this test, the district court properly concluded that the DOC's decision to discontinue Quest was reasonable. (Add. 4-10; J. App. Vol. 2 at 261-67; R. Doc. 38, at 4-10.)

23

### 1. There is a rational connection between the DOC's decision to discontinue Quest and its legitimate interest in rehabilitation and reducing recidivism.

The first factor the district court considered is whether there was a rational connection between the DOC discontinuing the Quest program and the legitimate government interest the DOC put forward to justify the program's cancellation. *Turner*, 482 U.S. at 89. The district court found that on the record before it, the DOC had valid and rational reasons to stop offering Quest.[5] The Quest program's depiction of women—particularly mothers—as the *reason* men commit crimes is not useful or valuable for incarcerated persons who are expected to enroll in DOC's sex offense or domestic violence programming. Quest's teachings do not align with the DOC's mission and goals of rehabilitation and reducing recidivism rates. Many incarcerated individuals have been convicted of crimes involving domestic abuse or sexual assault, and often they have been victims of those crimes themselves. Quest's teachings devalue certain individuals based on gender or sexual orientation and the DOC determined Quest's teachings could hinder the rehabilitation process. And to this point, Schmitt makes much of the DOC's description of Quest as "defining manhood, or the study of masculinity, through a biblical lens of what a 'real man

---

[5] On the limited record before it, the district court only considered the DOC's rehabilitation concerns, and not its security concerns, and found that the rehabilitative interest was enough to show a rational connection between the DOC's decision to terminate Quest and legitimate penological interests. (Add. 7-8; J. App. Vol. 2 at 264-65; R. Doc. 38, at 7-8.)

looks like.'" (App. Br. 5, 29, 33, 38.)  Here, the district court points to the obvious—this is how Schmitt himself describes Quest's teachings.  (Add. 8; J. App. Vol. 2 at 265; R. Doc. 38, at 8.)  The district court was clear that Schmitt's cherry picking does not survive the entire reading of the DOC's explanation for terminating Quest, which is that Quest teaches concepts (discrimination, exclusivity, gender biases, and stereotypes) that conflict with the DOC's rehabilitative mission.  (Add. 8-9; J. App. Vol. 2 at 265-66; R. Doc. 38, at 8-9.)

### 2. Schmitt has alternative means to communicate with incarcerated persons.

The second factor the district court considered is whether there are alternative means for Schmitt to exercise the right he claims the DOC is infringing.  *Turner*, 482 U.S. at 90.  Here, there are alternative means for Schmitt to communicate with incarcerated persons, and in Schmitt's words, "minister to men in prison." (App. Br. 4.)  He is not prohibited from volunteering, and he can propose different programming, including spiritual or religious-based programming, by submitting a Program Proposal Application.  He can also correspond with incarcerated individuals by mail and visit incarcerated individuals pursuant to the DOC's visiting policy.

And the question is not whether Schmitt can teach the Quest program in DOC prisons by alternative means.  If that were the test it would render this *Turner* factor meaningless.  The question is whether Schmitt has alternative means to exercise his

alleged First Amendment right to "minister to men" incarcerated in DOC facilities. *See Murchison v. Rogers*, 779 F.3d 882, 891 (8th Cir. 2015) (explaining that if the test was whether there was an alternative way to violate the prison regulation, then this *Turner* factor would be meaningless). The DOC rejected the content of the Quest program, not Schmitt as a volunteer based on his religious beliefs. If Schmitt applied to facilitate a different program, the DOC would evaluate whether the program supports its mission to reduce recidivism and whether it promotes its values of supporting a safety-conscious environment while providing evidence-based interventions. The district court correctly concluded that although Schmitt prefers to teach Quest as a DOC program in a group setting, his ability to communicate with incarcerated persons "individually through the normal visitation process is an alternative means for him to exercise his faith." (Add. 9; J. App. Vol. 2 at 266; R. Doc. 38, at 9.)

### 3. Accommodating Schmitt would have a negative impact on DOC facilities.

The third factor the district court considered is whether accommodating Schmitt's asserted constitutional right would burden DOC facilities. *Turner*, 482 U.S. at 90. The district court determined it would. (Add. 9; J. App. Vol. 2 at 266; R. Doc. 38, at 9.) The DOC has legitimate concerns about the content of the Quest program, and Schmitt has not proposed an accommodation that does not involve teaching the objectionable content. Thus, it appears there is no likely

26

accommodation that would both allow Schmitt to teach the content and allay the DOC's legitimate concerns that Quest's content undermines sex offense and domestic violence programming.

When an accommodation of an asserted right could have a significant "ripple effect," courts are particularly deferential to the discretion of corrections officials. *Murchison*, 779 F.3d at 891. Because MCF-SCL, as an intake facility, is the first stop for the majority of adult men sentenced to incarceration before transferring to other DOC facilities, there is a significant likelihood that the concerns associated with Quest's teachings would ripple through multiple DOC facilities. There is no obvious accommodation that would not have a negative and burdensome impact on DOC facilities.

### 4. There is no de minimis-cost alternative for keeping the Quest program active in DOC facilities.

The final factor the district court considered is whether a de minimis-cost alternative exists to accommodate Schmitt. *Turner*, 482 U.S. at 90. Schmitt insists on teaching Robert Lewis's Quest program, but he has not suggested a cost-effective way for the DOC to accommodate his desire to teach Quest without including the objectionable content. "Prison officials do not have to set up and then shoot down every conceivable alternative method of accommodating the claimant's constitutional complaint." *Id.* at 90–91. Accordingly, the district court determined that all four *Turner* factors weighed against Schmitt and that he was unlikely to

27

succeed on the merits of his claims.  (Add. 10; J. App. Vol. 2 at 267; R. Doc. 38, at 10.)

### B. Schmitt Did Not Establish He Would Suffer Irreparable Harm Without a Preliminary Injunction.

Schmitt argues that the loss of First Amendment freedoms, "even for minimal period of time, unquestionably constitutes irreparable injury."  (App. Br. 57.)  The problem Schmitt cannot overcome, however, is that he never established a constitutional right to enter a DOC prison and teach Quest.  (*See supra* I.)  And because Schmitt brought Section 1983 claims, he is not entitled to injunctive relief unless he makes a clear showing that he was deprived of a constitutional right. *Rogers v. Scurr*, 676 F.2d 1211, 1214 (8th Cir. 1982); *see also Gen. Motors Corp. v. Harry Brown's, LLC*, 563 F.3d 312, 319 (8th Cir. 2009) (stating failure to demonstrate irreparable harm is enough to deny a preliminary injunction).  Thus, Schmitt's hollow constitutional claim is not sufficient to establish irreparable harm.

### C. The Balance of Harms and the Public Interest Favored Denying Schmitt's Motion.

The last two *Dataphase* factors also favored denying Schmitt's motion.  The district court analyzed the balance-of-harms and public interest together because the factors merge when the government opposes injunctive relief.  *Nken v. Holder*, 556 U.S. 418, 435 (2009).  Schmitt did not clearly show the DOC's cancellation of Quest is a constitutional violation, therefore, he did not establish he would be harmed

28

without the injunction. (*See supra* III.B.) Whereas the DOC determined that several of Quest's core teachings conflict with its goals of rehabilitation and reducing rates of recidivism, and its policies against discrimination. *See Douglas v. Sigler*, 386 F.2d 684, 688 (8th Cir. 1967) (recognizing that state prisons are under control of executive branch and "courts will not interfere with the conduct, management, and disciplinary control of this type of institution except in extreme cases"). The risk of harm of continuing the program, therefore, significantly outweighs any alleged harm suffered by Schmitt in the absence of injunctive relief.

There is also strong public interest in allowing the DOC to exercise its discretion to create and enforce policies that promote rehabilitation, reduce recidivism, and prohibit harassment and discrimination, and to discontinue programs that contradict those policies. The DOC has significant discretion to approve or deny programs offered in its prisons. *See Turner*, 482 U.S. at 84-85 (recognizing that running a prison is an inordinately difficult task that requires expertise, planning, and commitment of resources and that courts therefore accord deference to prison authorities); *see also Scurr*, 676 F.2d at 1214 (vacating an injunction that interfered with the administration of a prison and would "leave too little discretion in the hands of prison officials who must deal with the very difficult issues of security within their institutions"); *Lewis*, 518 U.S. at 363 (stating "[t]he Constitution charges federal judges with deciding cases and controversies, not with running state

29

prisons.") (Thomas, J., concurring).  For these reasons, the district court correctly determined that the balance-of-harms and public interest factors favored denying Schmitt's motion.

## CONCLUSION

Schmitt has no constitutional right to dictate the content of the DOC's prison programming.  Even if he did, the district court correctly determined that DOC's decision to cancel Quest should be reviewed using *Turner*'s deferential standard and thus, it did not abuse its discretion when it denied Schmitt's preliminary injunction motion.  The Court should affirm.

Dated:  November 20, 2024   Respectfully submitted,

KEITH ELLISON
State of Minnesota
Attorney General


s/ Corinne Wright
CORINNE WRIGHT
Assistant Attorney General
Atty. Reg. No. 0390353
445 Minnesota Street, Suite 1400
St. Paul, Minnesota 55101-2131
(651) 757-1198 (Voice)
(651) 297-4139 (Fax)
corinne.wright@ag.state.mn.us

BRADLEY D. SIMON
Assistant Attorney General
Atty. Reg. No. 0390363
445 Minnesota Street, Suite 1400
St. Paul, Minnesota 55101-2131
(651) 757-1354 (Voice)
(651) 297-4139 (Fax)
bradley.simon@ag.state.mn.us

ATTORNEYS FOR APPELLEES

31

## CERTIFICATE OF COMPLIANCE
## WITH FRAP 32

1.      This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 6,952 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 365 in 14 pt Times New Roman font.

s/ Corinne Wright
CORINNE WRIGHT
Assistant Attorney General

## CERTIFICATE OF COMPLIANCE
## WITH 8th Cir. R. 28A(h)(2)

The undersigned, on behalf of the party filing and serving this brief, certifies

that the brief has been scanned for viruses and that the brief is virus-free.


s/ Clara Atkinson
CLARA ATKINSON


|#5919510-v3

Appellate Case: 24-2707    Page: 42    Date Filed: 11/20/2024 Entry ID: 5458792